718 So.2d 636 (1998)
Gerald E. HUNTER and Marlene Hunter, Plaintiffs-Appellants,
v.
BOSSIER MEDICAL CENTER, Defendant-Appellee.
No. 31026-CA.
Court of Appeal of Louisiana, Second Circuit.
September 25, 1998.
*638 Nelson, Hammons & Self by Parker Self, Shreveport, Kitchens, Benton, Kitchens & Warren by Graydon K. Kitchens, III, Minden, for Plaintiffs-Appellants.
Cook, Yancey, King & Galloway by Lisa Dunn Folsom, Shreveport, for Defendant-Appellee.
Before NORRIS, WILLIAMS and PEATROSS, JJ.
NORRIS, Judge.
Plaintiffs, Gerald E. Hunter and his wife, Marlene Hunter, appeal a jury verdict dismissing their medical malpractice claim against Bossier Medical Center. Plaintiffs contest the jury's decision and several procedural rulings of the trial judge. For the reasons assigned, we affirm.

FACTS AND PROCEDURAL HISTORY
After an automobile accident in 1990, Gerald E. Hunter began experiencing problems with his back. Some months later, he began seeing Dr. Michael Acurio, an orthopedic surgeon. In September of 1991, Dr. Acurio diagnosed a ruptured disk at the L3-4 spinal level and began a regimen of conservative treatment. However, that plan failed to alleviate Mr. Hunter's back problems and surgery was recommended after thorough discussions between the doctor and patient.
On February 12, 1992, Dr. Acurio performed a diskectomy and fusion[1] at the L3-4 level of Mr. Hunter's spine at Bossier Medical Center ("BMC"). Less than 15 hours later, Mr. Hunter sustained a slippage of the bone graft causing impingement on the spinal nerve and resulting in extreme pain in his back and down his left leg. Consequently, the next day, Dr. Acurio performed a second surgery where he removed the first bone graft and replaced it with a new one.
Two days after the second surgery, Dr. Acurio ordered rehabilitation in the form of walking or gait training, assisted by two people. On February 15, Mr. Hunter was twice moved out of his bed and walked 50 feet down the hall by BMC physical therapists. These rehabilitative efforts took place without incident.
On February 16, two BMC nurse's aids, Tommie Means and Ernestine Phipps, arrived to walk Mr. Hunter down the hall.[2] Both aids assisted him out of his bed and, with one on each side of him, walked him to the nurses station and back to his room where Marlene Hunter was waiting. Upon arrival, Ms. Means left Mr. Hunter's side and helped Mrs. Hunter remake the bed. Suddenly, Mr. Hunter told the aids he was dizzy. Thereafter, those present in the room differ in their version of what happened.
Tommie Means and Ernestine Phipps indicated that Ms. Phipps had stayed alongside Mr. Hunter and was holding his arm when he became dizzy; following standard protocol and procedure, Ms. Phipps leaned the patient back against her chest and allowed him to slide down her leg to the floor in a gentle manner. However, according to the Hunters, the patient was left alone with instructions to hold onto the wall; when he became *639 dizzy he fell backwards and hard on his backside with his left leg buckled underneath him.
Mrs. Hunter immediately summoned Nurse Beth Montano, who arrived at the doorway and found Mr. Hunter on the floor with his head leaning against Ms. Phipps. The nurse then asked Mr. Hunter if he was alright and received a positive reply. She then checked his vital signs and for any injury before returning him to bed. She later noted on Mr. Hunter's medical chart that he had been "assisted" to the floor by the nurse's aids and that he had no notable injuries. Dr. Acurio was immediately notified of the incident and took x-rays to evaluate the bone graft. At that time, no slippage of the bone graft was evident.
Two days later, Dr. Acurio discharged Mr. Hunter from BMC. However, after eight days, Mr. Hunter returned to the emergency room complaining that his pain had become "real bad two days ago" and that he could not sit down. At that time, Dr. McAlister, Dr. Acurio's partner, examined Mr. Hunter and obtained x-rays which showed the grafts to be in a good position. He gave Mr. Hunter a Morphine injection and discharged him again.
On February 24, Mr. Hunter saw Dr. Acurio in his office and was readmitted to BMC for pain control after complaining of pain and numbness in his left thigh. Dr. Acurio performed an x-ray, a CT scan and a myelogram which were of only "equivocal" value, not showing whether the bone graft might be impinging on the nerve. Therefore, the surgeon decided to do a third surgery for exploratory purposes. During that procedure, Dr. Acurio removed the previous graft and performed a posterior fusion, a method different from that used in the prior operations. Mr. Hunter went home on February 28.
After his release from the hospital, Mr. Hunter saw Dr. Acurio on eight occasions through August 11, 1992. During that period of time, Mr. Hunter reported little or no back pain although he continued to have a burning pain in his leg. Thereafter, Mr. Hunter moved to Kansas for a period of time and continued to complain of pain. Still later, after returning to the area, Mr. Hunter saw another orthopedic surgeon, Dr. James Zum Brunnen, for a Social Security disability examination on April 10, 1995. At that time Dr. Zum Brunnen found the pain in Mr. Hunter's lower back and left thigh to be severe enough to declare him totally and permanently disabled.
On September 3, 1992, the Hunters filed a claim pursuant to the Louisiana Medical Malpractice Act against BMC alleging that Mr. Hunter had fallen to the floor as a result of the failure of Ms. Phipps and Ms. Means to follow the proper standard of care on February 16, 1992, and that this resulted in the subsequent surgery and the continued leg and back pain. Thereafter, on March 9, 1994, the medical review panel ("MRP") reviewed the evidence presented and concluded it did not support the allegation that BMC had failed to meet the applicable standard of care.
The Hunters filed the instant suit in district court against BMC on May 26, 1994. However, prior to trial, they settled with BMC, its insurer, and its employees for significantly less than $100,000, reserving all rights against the Louisiana Patients Compensation Fund ("PCF"), the hospital remaining as the nominal defendant. Following a four day jury trial starting on March 31, 1997, the jury rendered a verdict in favor of the PCF.

DISCUSSION

Jury Verdict
In their first assignment of error, appellants contend that the jury erred in failing to find that BMC, through its employees, deviated from applicable medical standards in the care and treatment provided to Gerald E. Hunter.
In a medical malpractice action against a hospital, the plaintiff must prove, as in any negligence action, that the defendant owed the plaintiff a duty to protect against the risk involved, that the defendant breached that duty, that the plaintiff suffered an injury, and that the defendant's actions were a substantial cause in fact of the injury. Smith v. State, 523 So.2d 815 (La.1988), and *640 authorities therein; Alello v. Smith, 94-103 (La.App. 5th Cir.7/26/94), 641 So.2d 664, writ denied, 94-2231 (La.11/18/94), 646 So.2d 382. A hospital is bound to exercise the requisite standard of care toward a patient that the particular patient's condition may require and to protect the patient from external circumstances peculiarly within the hospital's control. A determination of whether a hospital has breached those duties depends upon the facts and circumstances of each particular case. Smith v. State, supra; Hunt v. Bogalusa Community Med. Center, 303 So.2d 745 (La.1974); Alello v. Smith, supra.
The resolution of whether alleged malpractice constitutes negligence as well as the assessment of factual conflicts, including those involving the contradictory testimony of expert witnesses, lie within the province of the trier of fact. Martin v. East Jefferson Gen'l Hosp., 582 So.2d 1272 (La.1991); Smith v. Lincoln Gen'l Hosp., 27,133 (La. App.2d Cir.6/21/95), 658 So.2d 256, writ denied, 95-1808 (La.10/27/95), 662 So.2d 3; Rowsey v. Jones, 26,823 (La.App.2d Cir.5/10/95), 655 So.2d 560. The jury's conclusions are entitled to great deference and will not be disturbed on review unless found to be manifestly erroneous or clearly wrong. Stobart v. State, 617 So.2d 880 (La.1993); Rosell v. ESCO, 549 So.2d 840 (La.1989); Smith v. Lincoln Gen'l Hosp., supra. Furthermore, in a medical malpractice action, a reviewing court will give great deference to a jury's findings when medical experts express different views, judgments and opinions on whether the standard of care was met in any given case. Maxwell v. Soileau, 561 So.2d 1378 (La.App. 2d Cir.1990), writs denied, 567 So.2d 1123, 1124 (La.1990) and authorities therein; Alello v. Smith, supra. Ultimately, the issue on review for manifest error is whether the jury's conclusion is a reasonable one. Stobart v. State, supra; Smith v. Lincoln Gen'l Hosp., supra.
The plaintiff's case consisted of testimony from Mr. and Mrs. Hunter, Drs. Acurio and Zum Brunnen, and medical records from BMC, Dr. Acurio, and various health care providers from Wichita, Kansas. As noted earlier, Mrs. Hunter testified that after returning her husband from his walk, Ms. Means left his side to go to the other side of the bed to make it while Ms. Phipps went to the near side of the bed to assist. At that moment, he said he felt dizzy and Ms. Means told him to hang on to the wall. Mrs. Hunter claimed that she hollered that her husband was "going down," but before the aids could react, he had hit the floor. After he was down, Ms. Phipps came over and grabbed his arm. Mrs. Hunter was certain he lost consciousness as he lay on the floor; when Nurse Montano arrived, he had just come to and said he was alright. Mrs. Hunter added that his complaints of left knee and thigh pain have been continuous since the incident.
Mr. Hunter testified next. He testified that after the second surgery and prior to his fall, he had no pain in his leg, experiencing only a soreness or throbbing at the location of the surgery. When the nurse's aids returned him to his room, they left his side to make the bed, neither within distance to grab him. When he got dizzy and felt like he would pass out, the aid on the far side of the bed told him to hold onto the wall just before he lost consciousness. Mr. Hunter next recalled waking up on the floor, his leg bent underneath him, and Nurse Montano speaking to him. Mr. Hunter stated that, on the day of the fall, his knee hurt real bad and his leg had "a little pain" but his back felt about the same as before the fall. Upon his release on February 18, he had "just soreness in [his] leg," "pain in [his] knee," and a "burning sensation in ... [his] leg from the knee down." However, after going home, the pain got worse and he returned to the hospital on February 21. A few days later, Dr. Acurio readmitted him and eventually performed a third surgery. In addition to the leg pain, he described a numbness which arose in the leg and later moved to his back. However, on cross-examination he revealed that the numbness did not develop until after the third surgery. These complications persisted through the time of trial.
Dr. Acurio, Mr. Hunter's treating physician, first detailed the treatment and events leading up to the decision to perform surgery on Mr. Hunter's back, including his discussion of the risks involved and the fact that he *641 would normally only expect about a 75 percent improvement. Thereafter, he described the first surgery and explained the necessity for performing the second surgery: the original bone graft slipped when Mr. Hunter rolled over in the bed and resulted in spasms in the left leg accompanied by excruciating pain. Dr. Acurio stated that after the second operation, Mr. Hunter "was doing well until the [fall]" with no pain except that related to the surgical incision. On February 15, 1992, the doctor issued a physical therapy order for Mr. Hunter to be ambulated, i.e. walked, twice a day with the assistance of two people.
Dr. Acurio's information about the fall was that Mr. Hunter became light headed without losing consciousness and hit the floor. Reviewing his records to refresh his memory, the doctor noted that on his first visit after the alleged fall Mr. Hunter did not complain of leg pain. However, on a second visit Mr. Hunter complained of pain down his left leg similar to that experienced after the first surgery but not as severe. However, the pain improved over the next two days. Cross-examination revealed that on February 17 the surgeon noted in the patient's medical record "no complaints of minimum pain, doing well, consider discharge tomorrow." Mr. Hunter left the hospital the next day in stable condition.
Dr. Acurio further testified that his partner, Dr. McAlister, saw the patient at the emergency room on February 21 and an xray taken at the time showed the graft was in the proper place and in good condition. Later defense testimony by the emergency room nurse, Kimberly Taylor, added that Mr. Hunter told her upon admission that "the pain became real bad two days ago." Dr. Acurio did not see Mr. Hunter until February 24 when he complained of pain and numbness in his left leg. At that point, the patient was readmitted into the hospital. An x-ray and a CT scan suggested, inconclusively, that scar tissue or a blood clot might possibly be putting pressure on a nerve. Thus, Dr. Acurio decided that a third, exploratory surgery, should be performed to assess the problem. On February 26, the surgery was performed and revealed some but not "marked" pressure on the nerve. With this opinion of the situation, the doctor decided at that time to remove the previous graft and performed the fusion in a different manner to prevent further pinching of the nerve. Dr. Acurio recalled that Mr. Hunter continued to complain of a burning type pain in his leg although the surgery had relieved some of the pain. Yet, on cross-examination, he admitted that Mr. Hunter had been pain free or complaining of "very little pain at all" on several of his eight visits through August 1992.
Although he did not witness the accident, Dr. Acurio opined, as the treating physician, that "something happened when [Mr. Hunter] fell" and that he "most likely believe[d] that [Mr. Hunter] fell and hit the floor in some way because his pain recurred ... after the incident." He further stated that he believed no problem would have occurred had Mr. Hunter been slid down to the floor as noted in the medical records and that the fall must have occurred more abruptly in the manner related to him by the Hunters.
Dr. Zum Brunnen, an orthopedic surgeon who testified by video deposition, confirmed Mr. Hunter's complaints of back and leg pain, said he was not malingering, and opined that there was some type of nerve impairment in the area near the previous surgeries. The plaintiffs also provided medical records from Dr. Leonard Klafta, an orthopedist who examined and treated Mr. Hunter after his move to Wichita. That doctor made observations similar to Dr. Zum Brunnen. Specifically, he noted that his x-rays showed that the likely source of the problems was pressure on the nerve caused by nerve root swelling. He found no evidence of nerve root compression, namely, pressure on the nerve from an external source such as the scar tissue he found near the surgery site. At best, his diagnosis was inconclusive.
Testifying for the PCF were the nurse's aids, Tommie Means and Earnestine Phipps, who had approximately six and 20 years experience respectively. As noted above, Ms. Means testified that when they arrived back in the room, the bed was unmade. At that point, they first walked Mr. Hunter near the bathroom. She then helped Mrs. Hunter *642 finish the bed while Ms. Phipps stayed with the standing patient and told him to hold onto the wall. When Mr. Hunter said he felt faint, he leaned back on Ms. Phipps, who "held him under his arm and sort of lifted him but let him slide to the floor on her leg." Ms. Means confirmed that the nurse's entry in the medical chart was correct and described the technique they had been taught in training as the proper method for handling a patient who was about to fall. She even identified a page from a training manual which illustrated the method.
Ms. Phipps, the other nursing assistant, essentially reiterated the testimony of Ms. Means, although she did not recall telling the patient to hold onto the wall. Ms. Phipps insisted that she leaned Mr. Hunter against her when he became dizzy and "eased him down" to the floor such that he was lying in a slanted position leaning against her; she was still in that position when Nurse Montano entered the room. She also noted that the method she used was accepted procedure and had been learned as part of her continued training. Furthermore, she stated that after they returned Mr. Hunter to bed, he told the nurse that he would have been hurt had it not been for Ms. Phipps knowing what to do. Finally, she corroborated Nurse Montano's notes.
Nurse Montano testified that at approximately 9:15 a.m., the emergency call light went off. Within seconds she was in the room and found Mr. Hunter leaning up against Ms. Phipps's legs, a placement consistent with the patient having been slid to the floor. She stated that this is the proper procedure and protocol. Mr. Hunter did not think he was hurt and made no complaints of pain. In fact, he commented he was glad Ms. Phipps was there, or otherwise, he would have been really hurt. Finally, after identifying her notes and confirming their accuracy, she testified that there would have been no problem with only one aid standing with Mr. Hunter while the other made the bed. She found there to be a significant difference in the proper procedure to follow in handling a standing patient versus one who is actually walking.
Dr. David Nathaniel Adams, an MRP member, testified as an expert in physical medicine, i.e. the treating and rehabilitation of patients with disabling injuries or diseases. Dr. Adams first indicated that as part of the panel's review, the members looked at the depositions of the two nurse's aids, Nurse Montano, the plaintiffs, and Dr. Acurio as well as all medical records. He stated that the review of the evidence led him and the other panel members to conclude that Mr. Hunter had been eased to the ground upon becoming dizzy. In particular, he noted that he and the panel thought it significant that the x-ray and fluoroscopy reports showed no slippage of the bone graft after the incident, that the patient was released from the hospital two days later, and that the assistants had over 20 years experience between them. These factors showed that no severe trauma had occurred. In addition, they placed importance on Nurse Montano's medical chart notation since it was their opinion, based on their experience and medical training, that this, being made close in time to the alleged fall, would be the most accurate account of the events that transpired. Individually, Dr. Adams stated that he found significant the fact that the Wichita medical records and examination seemed to indicate that the nerve impairment might be coming from a source not necessarily associated with the surgery performed at BMC. He also pronounced that the method employed by Ms. Phipps in sliding Mr. Hunter down her leg to the floor is the accepted procedure to use under the circumstances she faced.
Next, Dr. Austin Gleason, an orthopedic surgeon and MRP member, testified, first confirming Dr. Adams's attestation as to the basis for the MRP's opinion that the standard of care had not been breached. He also explained that slippage of the bone graft is a "common" complication of disk fusion surgery. He was satisfied that the x-rays taken immediately after the accident and the radiology report accompanying them confirmed that no slippage of the bone graft occurred. Additionally, Dr. Gleason stated that the panel put "a great deal in stock in" the fact that Dr. Acurio had taken x-rays, a CT scan and an MRI after the fall and found the situation to be stable.
*643 The last member of the MRP to testify was Dr. James O. Hudson, a general surgeon with approximately 20 years experience. He verified the testimony of the first two members regarding the conclusion of the panel that the standard of care had not been violated and the basis thereof, again emphasizing their reliance on the nurse's notes as being the most accurate account of the questioned incident and noting their dictation close in time to the actual event. He also agreed with Dr. Gleason that the x-ray report showed no slippage of the graft after the accident and found significance in Mr. Hunter's release just two days later. Indeed, the general surgeon even opined that Dr. Acurio's finding of the presence of some nerve impingement, as noted in a post-operative report, was probably calculated to warrant the need for the third surgery rather than because of any actual discovery of a problem. He noted that such conservative diagnoses are sometimes documented as a practical means of satisfying the patient and justifying the surgery.
Reviewing the totality of the evidence presented to the jury, it is clear that each side provided the fact finders with clearly conflicting factual accounts of the alleged fall and conflicting expert testimony. We find it reasonable for the jury to have accepted the account of the incident presented by the BMC employees and to have found that they used the medically appropriate standard of care under the circumstances. Even though an appellate court may feel its own evaluations and inferences are more reasonable than the fact finder's, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed where conflict exists in the testimony. Stobart v. State, supra; Rowsey v. Jones, supra. Consequently, based on our review of the abovementioned evidence, we conclude that the record discloses no manifest error and we affirm the jury's findings.

Admissibility of the MRP Opinion
By their second assignment of error, the plaintiffs contend that the trial judge erred in admitting the written opinion of the MRP and the attached reasons into evidence over their objection. This assignment lacks merit.
By argument, plaintiffs maintain that the MRP opinion should not be admitted because the panel did not render a "legally" correct opinion. It is contended that since the depositions of the nurse's aids and the Hunters provided conflicting accounts of the incident, the only opinion that could have been rendered by the panel under La.R.S. 40:1299.47 was that "there is a material issue of fact, not requiring expert opinion, bearing on liability for consideration by the court."[3] Even if this court were to find this technical argument to be correct,[4] we find it to have no bearing on the issue sub judice.
La. R.S. 40:1299.47 H provides in part:
Any report of the expert opinion reached by the medical review panel shall be admissible as evidence in any action subsequently brought by the claimant in a court of law, but such expert opinion shall not be conclusive and either party shall have the *644 right to call, at his cost, any member of the medical review panel as a witness. If called, the witness shall be required to appear and testify. (Emphasis added)
The Louisiana Supreme Court as well as this court have concluded on several occasions that the clear language of that statute makes the report of the MRP admissible at trial, even where "technical" defects exist. See, Galloway v. Baton Rouge Gen'l Hosp., 602 So.2d 1003 (La.1992); Smith v. Lincoln Gen'l Hosp., supra; Moore v. Curry, 577 So.2d 824 (La.App. 2d Cir.1991), writ denied, 580 So.2d 674 (La.1991); Maxwell v. Soileau, supra. The sole duty of the MRP is to express its expert opinion. No findings are made by the panel as to damages and the findings of the panel are not binding on the litigants. The panel simply renders an expert opinion and does not have the power to adjudicate the rights of any party. Maxwell v. Soileau, supra, citing Derouen v. Kolb, 397 So.2d 791 (La.1981).
In any event, even though the panel may have made a factual determination, any potential error is harmless. Every member testified as to the basis of their opinion and their conclusion that there was no deviation from the standard of care, and plaintiffs extensively cross-examined each doctor in an effort to refute that conclusion and to convince the jury that it had been based on an improper review of the evidence. See, Smith v. Lincoln Gen'l Hospital, supra; Maxwell v. Soileau, supra.

Expert Opinion Testimony of Dr. James Hudson
Plaintiffs next contend that the trial court erred in allowing, over objection, Dr. James Hudson, an MRP member, to testify beyond his area of expertise. In particular, they complain he should not have been allowed to testify regarding any of the surgeries performed by Dr. Acurio.
Initially, Dr. Hudson was tendered and accepted, without challenge, as an expert in general surgery. Later, in reviewing the basis for the panel's decision, the PCF's counsel asked the doctor to explain the surgery Mr. Hunter originally underwent. At that point, plaintiff's counsel objected to the question as being beyond the scope of the witness's expertise because it related to an "orthopedic procedure." The trial judge overruled the objection. The surgeon then explained how he had reviewed the surgery records involved in the case, specifically noting that he is "familiar with orthopedic surgery to some degree," and gave his analysis of those records. Additionally, relying on his 20 years of general surgical experience, the doctor gave his previously mentioned interpretation of Dr. Acurio's surgery dictation notes.
It is a physician's experience and knowledge of the requisite subject matter which determines whether he may testify as to the degree of care which should be exercised. A particular physician's knowledge of the subject matter on which he is to offer expert testimony is determined on a case-bycase basis. McLean v. Hunter, 495 So.2d 1298 (La.1986); Mitchell v. Kedia, 94-89 (La. App. 5th Cir.10/12/94), 645 So.2d 730. Furthermore, the qualification of an expert witness rests within the sound discretion of the trial judge and his determination will not be disturbed absent manifest error. Generally, the fact that a medical doctor is not a specialist in a particular field applies only to the effect on the weight to be given such testimony, not to its admissibility. Tyler v. Richardson, 476 So.2d 899 (La.App. 2d Cir.1985), writ denied, 478 So.2d 907 (La.1985); Chatelain v. U.S. Fidelity & Guar. Co., 495 So.2d 379 (La.App. 3d Cir.1986), writ denied, 498 So.2d 756 (La.1986).
Considering Dr. Hudson's lengthy experience as a general surgeon, his professed knowledge of orthopedic surgical techniques, and his status as a member of the MRP in this case, we find no manifest error or abuse of discretion in the trial court's decision to allow the doctor to testify about the surgery performed by Dr. Acurio. The district judge correctly ruled that plaintiffs' arguments went to the weight of the evidence rather than its admissibility. Therefore, appellant's assignment is without merit.

Court Costs
In their last assignment, plaintiffs contend that the trial judge erred in assessing one-half *645 of the court costs against them. They maintain that the PCF, who requested the jury trial, is a state agency and is required to pay all court costs under the dictates of La. R.S. 13:5105 B.[5] However, pretermitting any determination of whether the PCF is a state agency, we reject appellant's argument.
Prior to the enactment of § 5105B, the Louisiana Supreme Court, in Williams on Behalf of Williams v. Kushner, 449 So.2d 455 (La.1984), specifically addressed the application of La. R.S. 13:5105 to medical malpractice suits. Therein, the court stated:
Because a suit under the medical malpractice act is against the health care provider and not against the Fund, an alleged state agency, La.R.S. 13:5105 is inapplicable. From the inception to the conclusion of a medical malpractice proceeding, the action is against only the health care provider. See, Forstall v. Hotel Dieu Hospital, 429 So.2d 213 (La.App. 4th Cir.), writ denied, 433 So.2d 1054 (La.1983). La.R.S. 40:1299.47(A)(1) provides that all "malpractice claims against health care providers" (emphasis added) shall first be reviewed by a medical review panel. If, after an agreement to a settlement, the claimant demands an excess amount from the Fund, a petition is filed by the claimant in the "court in which the action is pending against the health care provider." Id. § 1299,44(C)(1) (emphasis added). La. R.S. 40:1299.44(B) provides that the only claim against the Fund shall be a request by the commissioner after he receives a certified copy of a final judgment, court approved settlement or final award in an arbitration proceeding "in excess of one hundred thousand dollars against a health care provider" (emphasis added). Hence, the only party defendant contemplated by the medical malpractice act is the health care provider. [footnote omitted] The Fund is not specified as a party defendant against whom the action can be brought under the act. [footnote omitted] If the legislature had intended that the Fund may be a party defendant, it could have so provided as it has done in numerous statutes involving suits against other alleged state agencies, state officers or political subdivisions. See, e.g., La.R.S. 18:1402 (election contests); La.R.S. 23:1634 (unemployment compensation); La.R.S. 40:62 & 68 (birth certificates); La.R.S. 49:461 (suits against state ministerial officers). Therefore, a medical malpractice action is not a suit against the Fund, and La.R.S. 13:5105 is inapplicable. Because of this holding, we do not reach whether the Fund is a state agency within the definition of La.R.S. 13:5102(A).
Id., at p. 458.
That same rationale is applicable in the present case.[6] Therefore, we conclude that the court should look to the defendant health care provider's classification as a state or non-state agency and not such status of the PCF when determining how court costs should be apportioned to the litigants. BMC is not a state agency.
Hence, addressing plaintiff's assignment of error, it is well established law that the court may render judgment for costs, or any part thereof, against any party, as it may consider equitable. La. C.C.P. art.1920. The trial court thus has great discretion in determining and allocating court costs. Cajun Elec. Power Coop. v. Owens-Corning Fiberglass Corp., 616 So.2d 645 (La.1993); Gould v. Gould, 28,996 (La.App.2d Cir.1/24/97), 687 So.2d 685; Matter of Succ. of James, 27,639 (La.App.2d Cir. 12/6/95), 665 So.2d 715. Considering plaintiffs did not prevail on their claim in the present case, we clearly see no abuse of the trial court's great discretion in *646 assessing them with only 50 percent of the costs. Therefore, we find no error.

CONCLUSION
For the reasons assigned, the judgment of the district court is affirmed. Costs of appeal are assessed to plaintiffs.
AFFIRMED.
NOTES
[1] This procedure involved removing the disk between the two vertebrae at that location and filling in the space with a bone graft which allows the two vertebrae to grow or "fuse" together into one bone.
[2] As February 16, 1992 was a Sunday, the physical therapy department was closed. Thus, Mr. Hunter's nurse asked the two nurse's aids to walk Mr. Hunter on that date.
[3] The pertinent portions of the statute provide as follows:

G. The panel shall have the sole duty to express its expert opinion as to whether or not the evidence supports the conclusion that the defendant or defendants acted or failed to act within the appropriate standards of care. After reviewing all evidence and after any examination of the panel by counsel representing either party, the panel shall, within thirty days but in all events within one hundred eighty days after the selection of the last panel member, render one or more of the following expert opinions, which shall be in writing and signed by the panelists, together with written reasons for their conclusions:
(1) The evidence supports the conclusion that the defendant or defendants failed to comply with the appropriate standard of care as charged in the complaint.
(2) The evidence does not support the conclusion that the defendant or defendants failed to meet the applicable standard of care as charged in the complaint.
(3) That there is a material issue of fact, not requiring expert opinion, bearing on liability for consideration by the court. * * *
[4] It should be noted that La. R.S. 40:1299.47(G) provides that the review panel may render "one or more" expert opinions. Thus, it is conceivable that a panel might render an opinion for or against a party while also finding that issues of material fact still exist.
[5] La. R.S. 13:5105 B provides: "Whenever a jury trial is demanded by the state, state agency, or the plaintiff in a lawsuit against the state or state agency, the party demanding the jury trial shall pay all costs of the jury trial, including the posting of a bond or cash deposit for costs in accordance with Code of Civil Procedure Articles 1733 through 1734.1, inclusive."
[6] Acts 1993, No. 993 created § 5105 B and allowed previously prohibited jury trials against the state. The provision became effective January 1, 1994 and both sides concede that if applicable would effect the outcome of this case. Even so, we find that the change to the amendment does not effect the rationale of Williams on Behalf of Williams.