| t CARAWAY, J.
This case involves a dispute over the diagnosis of Complex Regional Pain Syndrome, Type I, also known as Reflex Sympathetic Dystrophy (“RSD”). RSD is a pain disorder affecting the sympathetic nerve system, and it was first diagnosed in plaintiff 19 months following an automobile accident which initially caused soft tissue *916 injuries to both of plaintiffs legs immediately below the knee. The defendant, which does not challenge its liability for the accident, presented expert medical testimony disputing the diagnosis of RSD. The trial court ruled in favor of defendant’s position and limited plaintiffs general damages for only her soft tissue injuries. Plaintiff appeals this ruling. From our review of the expert medical testimony which rests significantly on the plaintiffs credibility in the reporting of her pain symptoms, we find no manifest error in the ruling and affirm.

Facts

On July, 11, 2000, Dixie Aaron (“Aaron”) was a guest passenger in a Porsche being test-driven by her sister, Stacey. The owner of the vehicle filed a complaint with the Shreveport Police department alleging that his car had not been returned. Accordingly, police officers made a traffic stop of Aaron and her sister. Their patrol car stopped beside the Porsche at an angle towards the right rear of the vehicle. The officer inadvertently failed to place the police vehicle in park. Thereafter, an officer approached the Porsche and requested that Aaron exit the vehicle and stand on the right side of the car. While she stood there, the police car began to roll slowly forward eventually pinning Aaron’s knees between the two cars. A video [¡.camera attached to the police vehicle recorded the entire incident. After the accident, Aaron required no immediate medical attention and was able to walk with some assistance from the scene. Some four hours later, however, Aaron reported to the emergency room complaining of leg and knee pain. She was then diagnosed with anterior contusions of the knee area of both legs and given pain medication and released.
Aaron reported to her primary care physician on July 18, 2000. He eventually referred her to Dr. Edward Morgan, an orthopedic surgeon. Aaron first visited Dr. Morgan on August 28, 2000. From August 28, 2000 until September 28, 2001, Aaron complained of global burning pain to Dr. Morgan. He required that Aaron undergo physical therapy which Aaron received through August of 2002. Because of Aaron’s continuing pain, Dr. Morgan referred Aaron to Dr. Donna Holder, an anesthesiologist specializing in pain management. Aaron first saw Dr. Holder on February 13, 2002, more than one year and a half after the accident. Ultimately, Dr. Holder diagnosed Aaron with RSD, which the doctor opined would require ongoing treatment.
On December 1, 2000, Aaron filed suit against the City of Shreveport seeking damages for the injuries she received in the July 11, 2000 accident. Aaron sought a summary judgment on the issue of liability which was granted by the trial court. That issue is no longer disputed by the City. A bench trial on the issue of damages was held.
The medical history presented to the court by Aaron revealed that after she was pinned between the two vehicles, she felt pain pressure on |3both knees. She was unable to obtain a ride to the hospital emergency room until near midnight. X-rays were not taken of her knees because she could walk.
Following the night of the accident, Aaron experienced pain and swelling in her knees. She testified that this condition was helped by physical therapy and later Dr. Holder’s treatment. At the time of trial, Aaron stated that she experienced constant burning, aching and stabbing pains, along with swelling and purple and red spots on her feet and coldness in her legs. Aaron admitted that she did not see the first doctor to whom she was referred by her family doctor because she caused a confrontation in his office. She also con *917 ceded that she told her other doctors that the doctor refused to see her because of the litigation.
To cast doubt on the cause of Aaron’s symptoms and for impeachment purposes, the City presented the testimony of Corporal Prunty of the police department in an attempt to show Aaron’s physical condition at the time of a subsequent police incident over a year after the July, 2000 accident. Corporal Prunty testified that on August 2, 2001, he received a report of someone breaking into an apartment. When he got to the apartment complex, he found that the door and frame of one of the apartments had been splintered. Aaron’s right shoe print marked the door. Prunty found the apparently drunk Aaron who admitted that she had accidentally kicked in the door. Corporal Prunty drove Aaron home and afterwards she requested that the officer misspell her name in the police report because of the present lawsuit. Corporal Prunty knew Aaron because |4he had made five domestic calls involving her and her friends, four of which involved Aaron’s intoxication.
When questioned regarding the August 2, 2001 door incident, Aaron characterized the incident as accidental which was her explanation of her failure to report the incident to Dr. Morgan. She stated that she barely kicked the door and that the door and frame shattered because they were not very sturdy. She denied abusing alcohol. She was not sure if she told the officer who drove her home to misspell her name because of her involvement in the lawsuit.
After considering the evidence and the conflicting medical testimony, the trial court fully accepted testimony and opinion of the City’s expert, Dr. Roger Kelley, that Aaron did not suffer from RSD. Alternatively, the court found that if Aaron did have RSD, she failed to prove that it was caused by the July 11, 2000 accident because the evidence showed that it could have been caused: by the door incident of August 2001, or other aggressive and inappropriate behavior by Aaron.' Finally, the court questioned Aaron’s credibility finding that her kicking of the-door belied her complaints of constant pain and that her attempts to diminish the door-kicking incident revealed her lack of veracity. Nevertheless, the court ultimately determined that Aaron’s medical reports adequately established some injury to her as the result of the accident and awarded $25,000 general damages and- special damages excluding the expenses for the two lumbar blocks and Dr. Holder’s treatment. The court rejected Aaron’s claim for the cost of future medical |,.¡treatment for the RSD as set forth by an economic expert and declined to assess as costs the expert fees associated with the RSD claim.'
On appeal, Aaron argues that the trial court erroneously concluded that Aaron did not suffer from RSD caused by the accident when the objective evidence showed otherwise. She also asserts that the trial court attached undue weight to the testimony of Dr. Kelley rather than Dr. Holder and Dr. Morgan, Aaron’s treating physicians, in making those determinations.

Discussion-

Absent manifest or clearly wrong error, the court of appeal may not set aside the factfinder’s finding of fact. To reverse a factfinder’s factual determinations, the court of appeal must find (1) that a reasonable factual basis does not exist on the record; and (2) that the record establishes that the finding is manifestly erroneous or clearly wrong. The reviewing court must do more than review-the record for some evidence which supports or controverts the factfinder’s determination. -Instead, the appellate court must review the *918 entire record to determine whether the conclusion was reasonable. Even if an appellate court concludes its own evaluations and inferences are more reasonable than the factfinder’s, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review where testimony conflicts. Cormier v. Comeaux, 98-2378 (La.07/07/99), 748 So.2d 1123.
Very recently, the Louisiana Supreme Court discussed the law regarding the weighing of expert testimony in Miller v. Clout, 03-0091 (La 10/21/03), 857 So.2d 458. In Miller, the court recognized the jurisprudential doctrine developed in the appellate courts that indicates that the testimony of a treating physician should be accorded greater weight than the testimony of a physician who has only seen the party for purposes of rendering an expert opinion concerning the party’s condition. However, the Miller court explained that the treating physician’s testimony is not irrebuttable, as the trier of fact is required to weigh the testimony of all the medical witnesses. In summarizing the legal principle, the court concluded that “the inquiry is whether, based on the totality of the record, the [factfinder] was manifestly erroneous in accepting the expert testimony presented by defendants over that presented by plaintiff.” Miller, fn. 3 at 462.
In Perow v. Lenzly, 30,833 and 30,834 (La.App.2d Cir.8/19/98), 716 So.2d 519, the plaintiffs’ medical complaints rested largely on their reports of subjective symptoms of pain which the trial court rejected. This court affirmed the trial court’s ruling on the following authority:
The weight afforded a treating physician’s testimony is largely dependent upon the facts upon which his opinion is based. A claimant’s lack of credibility on factual issues can serve to diminish the veracity of her complaints to a physician.
In evaluating the evidence, the trier of fact should accept as true the uncontra-dicted testimony of a witness, even though the witness is a party, where the record indicates no sound reason for its rejection. One sound reason for rejection is where circumstances cast suspicion or doubt on the reliability of the testimony. [Citations omitted]
Id. at 523.
| .¡.Moreover, in a personal injury action, the plaintiff must prove by a preponderance of the evidence that the claimed injuries resulted from the accident at issue. Maranto v. Goodyear Tire & Rubber Co., 94-2603 (La.2/20/95), 650 So.2d 757; Bruce v. State Farm Ins. Co., 37,704 (La.App.2d Cir.10/29/03), 859 So.2d 296.
Cumulatively, the expert testimony showed that RSD is a condition affecting the sympathetic nervous system which sometimes is precipitated by even slight trauma. Most cases of RSD manifest within two to six months after the accident. In 1994, the International Association of Pain Management published criteria for the diagnosis of RSD which includes subjective complaints of burning, aching or throbbing pain by the patient. Additional symptoms include hypersensitivity to touch (hyperesthesia) and stimulus that is not painful (allody-nia), swelling, color changes in the extremity or reddening of the area, changes in the skin secondary to decreased blood flow, loss of hair in the affected area, loss of normal nail patterns and temperature changes in the extremity. The experts agreed that people exhibit RSD symptoms differently and there exists no stand-alone test for diagnosing the disorder. Expert opinions differ regarding what symptoms constitute the disorder.
*919 Dr. Morgan testified that he treated Aaron for approximately fifteen months after the accident and initially diagnosed her with contusions to the knees. During that time, he consistently reported' that Aaron was experiencing residual and. burning pain with no evidence of hypersensitivity to touch, temperature or skin changes or bone bruising. |sAaron reported some incidents of her knees giving way. Dr. Morgan referred Aaron to physical therapy for muscle strengthening.[1] He also ordered a three-phase bone scan and MRI which were negative. He testified that Aaron did not have the classic symptoms of RSD and that he could not corroborate a diagnosis of RSD.
On her August 15, 2001 visit with Dr. Morgan, Aaron reported further pain and Dr. Morgan noted that she was “suffering from a chronic pain type syndrome with associated inflammation of both of her pes bursae regions.” Then, on October 1, 2000, Dr. Morgan referred Aaron to Dr. Holder to “see if any of the chronic pain symptoms versus RSD may be a component in her pain manifestation.”
Dr. Holder stated that she first saw Aaron on February 13, 2002. At that time, Aaron complained of bilateral leg pain. Dr. Holder found evidence of'subtle swelling in Aaron’s left ankle, mild hy-perthesia and allodynia of the inner knees and coolness to touch of the left inner thigh and left dorsum of foot. She explained that symptoms in areas other than the original place of trauma is typical in RSD cases. Dr. Holder also testified that the symptoms of RSD wax and wane until a patient reaches the later stages of development. In RSD, the pain may not initially be constant, but as the. disease progresses the pain becomes constant. Based upon these findings, Dr. Holder diagnosed Aaron with probable RSD and recommended a sympathetic lumbar block to confirm that diagnosis.
19Pr. Holder explained that RSD occurs when trauma is experienced by an individual which sets off a reflex cycle within the spinal cord which transmits pain. This pain cycle, eventually triggers the sympathetic nervous system, so that no stimulus to other, .nerves is necessary for the resulting constant pain syndrome. The lumbar block procedure stops or reverses the cycle and results in pain relief. A successful block will result in an increase in temperature in the affected extremity as well as pain and sensitivity relief. Dr. Holder was of the opinion that the lumbar block was the “gold standard” diagnostic test for RSD and that pain was the hallmark symptom of the disease.
Aaron received two left side lumbar blocks (4/9/02 and 9/10/02) from Dr. Holder which resulted in pain and sensitivity relief in both sides and temperature increases in her left foot. From those results, Dr. Holder changed Aaron’s diagnosis to definite RSD.
Dr. Holder was of the opinion that the July 11, 2000 accident was the cause of the RSD although she was aware of the August 2, 2001 door incident. She admitted that kicking a door would cause trauma that can precipitate RSD and that a physician could only separate the trauma from the two incidents by the medical records. However, she stated that the swelling and pain that Aaron experienced prior to August 2, 2001 was sufficient to show that the RSD was caused by the July 11, 2000 accident.
*920 Plaintiffs expert, Dr. William S. Whyte, II, an interventional spine pain expert, confirmed the importance of the lumbar block for diagnosing RSD but admitted that there exists no stand-alone test for confirming the |indisorder and that RSD is hard to diagnose. He explained that the symptoms of RSD will usually develop within two to six months after the trauma. Based upon his 2003 examination of Aaron, Dr. Whyte testified that Aaron more probably than not suffered from RSD. Dr. Whyte admitted that he had never seen any patient develop RSD one and one-half years after the trauma. Upon reviewing Dr. Morgan’s notes, Dr. Whyte conceded that Dr. Morgan’s records lacked any mention of symptoms associated with RSD during March-September 2001.
Unlike plaintiffs experts, Dr. Kelley did not consider the lumbar block to be the “gold standard” for diagnosis and considered the pain relief and temperature change as merely “supportive” of the diagnosis. Dr. Kelley testified that a placebo block must also be given as part of a patient’s evaluation because a placebo can exhibit the same effects as a block and show that the trouble is not in the sympathetic nervous system.
Dr. Kelley explained that in the case of RSD, the typical objective findings include smooth, shiny atrophic skin. Many studies do not include pain as part of the criteria. Additionally, supportive evidence of RSD includes temperature changes in the affected area. Dr. Kelley testified that during the year Dr. Morgan saw Aaron, the RSD signs should have evidenced themselves. He agreed with Dr. Whyte that the objective RSD symptoms for diagnosis should manifest themselves within a two to six month time. He stated that RSD is not an episodic disorder and the changes that take place should remain. In other words, he stated that once the objective findings were exhibited, they would not disappear.
| nDr. Kelley testified that “there is quite a bit of conflict between groups in terms of what exactly constitutes [RSD].” When questioned by the court regarding what he believed to be the “gold standard” for diagnosis of RSD, Dr. Kelley stated that significant atrophic skin changes with motor dysfunction, wearing of bone to inactivity and diminished temperature in the extremities would indicate definitive RSD in his opinion.[2] Probable RSD would be indicated by altered skin temperature, skin coloration changes, variable motor dysfunction, loss of range of motion and possible burning pain.
Dr. Kelley conducted a neurological evaluation of Aaron, a few days after Dr. Holder’s first examination. Unlike Dr. Holder, during Dr. Kelley’s examination of Aaron, he noted no increased sensitivity to touch, no skin colorations or shiny skin, no temperature changes and no weakness in her extremities. Dr. Kelley agreed that temperature changes and trophic changes tend to fluctuate, but that atrophic skin changes or shiny skin does not. Based upon his examination, Dr. Kelley could not find any evidence strongly supportive of the diagnosis of RSD. Dr. Kelley opined that her difficulties were musculoskeletal rather than neurological.
After reviewing the totality of the record before us, we are unable to conclude that the trial court erred in accepting the opinion of defendant’s expert over that of Aaron’s treating physicians, Dr. Morgan and *921 Dr. Holder. Clearly, the expert testimony and the learned medical literature presented by ligthe parties are necessary for the court’s understanding of RSD. Nevertheless, admissibility of and reliance upon expert testimony rest upon the standards of control and testability for the technique, reasoning or methodology employed by the expert. Cf., State v. Foret, 628 So.2d 1116 (La.1993) and its review of Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). In this case, honest conflicts were presented at trial by the experts regarding the signs and symptoms necessary for the diagnosis of the RSD disorder. Added to that conflict is the accepted fact that the initial trauma for RSD can be minor with the resulting RSD symptoms exhibited in areas of the patient’s extremity removed from the trauma site. Finally, a large measure of the diagnosis at least in the initial stages of RSD rests upon the subjective reports of pain by the patient. Therefore, in the absence of a placebo block test discussed by Dr. Kelley, the trial court’s measure of the credibility of Aaron must be accorded great weight and should not be disturbed on appeal.
With this in mind, we find that Dr. Morgan’s reports and his inability to diagnose and document RSD and its symptoms for over a year following the accident provided the trial court with a significant factual basis for the ruling. Also, the record contained numerous instances where Aaron’s credibility was impeached, allowing the trial court to discount her reporting of the pain symptoms to her physicians. From this evidence, it was reasonable for any factfinder to conclude that Aaron’s had failed to prove by a preponderance of the evidence that her alleged RSD was caused by the July 11, 2000 accident.
|13In light of this determination, it is unnecessary that we address Aaron’s request for an increase in the damage award based upon the RSD. Moreover, because we find favorably for the City on the issues regarding RSD, we can find no abuse of discretion in the trial court’s failure to tax as costs the expert fees of Dr. Holder and the economic expert.
The court shall determine that amount of the expert fees to be taxed as costs to be paid by the party cast in judgment. La. R.S. 13:3666. The trial court has wide discretion in allocating and determining court costs. Hunter v. Bossier Medical Center, 31,026 (La.App.2d Cir.9/25/98), 718 So.2d 636; Succession of James, 27,639 (La.App.2d Cir.12/6/95), 665 So.2d 715.

Conclusion

For the foregoing reasons, we find no manifest error in the trial court’s determination. Accordingly, the judgment of the trial court is affirmed at Appellant’s costs.
AFFIRMED.

. Aaron’s physical therapist, Douglas Tietjen, testified at trial that during his treatment of Aaron she exhibited symptoms mimicking RSD. He reported this in January of 2001. The trial court discounted this testimony instead relying solely on the experts.

. Indeed, plaintiff's exhibit 14h, a 2002 article discussing the criteria for RSD diagnosis, confirmed the absence of a "gold standard” for the diagnosis of RSD and expressed a general dissatisfaction with available criteria that resulted in the use of "personally favored terminology and criteria.”