# STATE OF LOUISIANA

# COURT OF APPEAL, THIRD CIRCUIT

# 06-1103

DAVID LANNINGHAM, ET AL.

VERSUS

BENJAMIN F. WALTON, M.D., ET AL.

**********

APPEAL FROM THE
NINTH JUDICIAL DISTRICT COURT
PARISH OF RAPIDES, DOCKET NO. 209,164
HONORABLE GEORGE C. METOYER, JR., DISTRICT JUDGE

**********

JAMES T. GENOVESE
JUDGE

**********

Court composed of Marc T. Amy, David J. Painter, and James T. Genovese, Judges.

AFFIRMED.

Joseph T. Dalrymple
Rivers, Beck, Dalrymple & Ledet
5208 Jackson Street Extension, Suite A
Post Office Drawer 12850
Alexandria, Louisiana 71315-2850
(318) 445-6581
COUNSEL FOR PLAINTIFFS/APPELLANTS:
    David Lanningham and Sandra Double

Eugene J. Sues
Gold, Weems, Bruser, Sues & Rundell
2001 MacArthur Drive
Post Office Box 6118
Alexandria, Louisiana 71307-6118
(318) 445-6471
COUNSEL FOR DEFENDANTS/APPELLEES:
    Dr. Benjamin F. Walton and
    Louisiana Medical Mutual Insurance Company

**GENOVESE, Judge.**

Plaintiffs, David Lanningham and Sandra Double, appeal an adverse judgment following a bench trial on their medical malpractice claim. The trial court found that Plaintiffs failed to satisfy their evidentiary burden of proving that Defendant, Dr. Benjamin F. Walton, breached the requisite standard of care. For the following reasons, we affirm.

## STATEMENT OF THE CASE

On May 16, 2000, Mrs. Billie Cloninger, seventy-five years of age, was hospitalized at the instruction of her primary treating physician, Dr. Alejandro Perez, at Christus St. Frances Cabrini Hospital (Cabrini Hospital) in Alexandria, Louisiana. According to the testimony of Dr. Perez, Mrs. Cloninger's chief complaints, upon admission to Cabrini Hospital, were generalized weakness, shortness of breath, and edema. During Mrs. Cloninger's hospitalization, Dr. Perez consulted the Defendant, Dr. Benjamin F. Walton, a pulmonologist, to evaluate Mrs. Cloninger for shortness of breath. Dr. Perez was aware that Mrs. Cloninger had previously been under Dr. Walton's care for treatment of bronchiectasis.[1] On the evening of May 19, 2000, Mrs. Cloninger was discharged from the hospital. At some time after arriving at her home, she suffered cardiopulmonary arrest. Mrs. Cloninger was then transported by ambulance to Cabrini Hospital's emergency room in acute respiratory failure. On May 20, 2000, Mrs. Cloninger expired soon after being removed from life support. An autopsy was not performed on Mrs. Cloninger.

On May 18, 2001, two of Mrs. Cloninger's children, David Lanningham and

---

[1]As defined in *The Signet Mosby Medical Encyclopedia*, bronchiectasis is "a chronic pulmonary condition which makes one highly susceptible to contraction of pneumonia." According to the record, Mrs. Cloninger was diagnosed with bronchiectasis in 1998.

1

Sandra Double, filed a complaint of medical malpractice against Dr. Walton with the Louisiana Patients' Compensation Fund. On May 7, 2002, a medical review panel unanimously determined that Dr. Walton met the applicable standard of care in his treatment of Mrs. Cloninger. Thereafter, David Lanningham and Sandra Double instituted the present lawsuit against Dr. Walton and Louisiana Medical Mutual Insurance Company (LAMMICO), his medical malpractice liability insurer. A bench trial was held on February 21 and 22, 2006, wherein the trial court rendered judgment in favor of Dr. Walton. Plaintiffs appeal.

## ISSUE

Plaintiffs assert that the trial court erred as a matter of law in holding them to an improper burden of proof. Specifically, Plaintiffs direct this court to the trial court's oral reasons for judgment, wherein the trial court stated, "[t]here is nothing to indicate to the court that the [P]laintiffs have proven either through clear and convincing evidence, or beyond a reasonable doubt, that Dr. Walton fell below the reasonable standard of care as required by physicians who practice similar medicine."

## STANDARD OF REVIEW

A trial court's findings of fact will not be disturbed unless they are manifestly erroneous or clearly wrong. *Fuselier v. State, through Dep't of Transp. & Dev.*, 05-681 (La.App. 3 Cir. 1/11/06), 919 So.2d 867, *writ denied*, 06-334 (La. 4/28/06), 927 So.2d 289. "This standard, however, is not applicable when one or more legal errors by the trial court interdicts the fact-finding process, and, when permitted by the record, the appellate court should conduct a de novo review to determine the preponderance of the evidence." *Trahan v. Deville*, 05-1482, p. 2 (La. App. 3 Cir. 5/10/06), 933 So.2d 187, 190, *writ denied*, 06-2103 (La. 11/17/06), 942 So.2d 534

2

(citation omitted). "Legal errors occur when trial courts prejudicially apply incorrect principles of law." *Id.* "These errors are prejudicial when they materially affect the outcome of the matter." *Id.* "In these cases, appellate courts are bound, if possible, to apply the correct principles of law, determine material facts, and render judgment on the record." *Id.* After reviewing the record, we agree with Plaintiffs that the trial court, through its articulation of the wrong burden of proof applicable to this type of case, committed legal error. The burden of proof in a medical malpractice case is *by a preponderance of the evidence*, not by clear and convincing evidence or beyond a reasonable doubt. *See* La.R.S. 9:2794.[2] Thus, finding legal error present, we shall review this matter *de novo*.

---

[2]Specifically, La.R.S. 9:2794 states in pertinent part as follows:

A. In a malpractice action based on the negligence of a physician . . . the plaintiff shall have the burden of proving:

(1) The degree of knowledge or skill possessed or the degree of care ordinarily exercised by physicians . . . licensed to practice in the state of Louisiana and actively practicing in a similar community or locale and under similar circumstances; and where the defendant practices in a particular specialty and where the alleged acts of medical negligence raise issues peculiar to the particular medical specialty involved, then the plaintiff has the burden of proving the degree of care ordinarily practiced by physicians . . . within the involved medical specialty.

(2) That the defendant either lacked this degree of knowledge or skill or failed to use reasonable care and diligence, along with his best judgment in the application of that skill.

(3) That as a proximate result of this lack of knowledge or skill or the failure to exercise this degree of care the plaintiff suffered injuries that would not otherwise have been incurred.

. . . .

C. In medical malpractice actions the jury shall be instructed that the plaintiff has the burden of proving, by a preponderance of the evidence, the negligence of the physician . . . . The jury shall be further instructed that injury alone does not raise a presumption of the physician's . . . negligence.

3

Plaintiffs, pursuant to La.R.S. 9:2794 and the jurisprudence interpreting said statute, had the burden of proving, by a preponderance of the evidence, the following: (1) the standard of care for treating a patient such as Mrs. Cloninger; (2) that Dr. Walton breached that standard of care; and (3) that the breach caused Mrs. Cloninger's injuries. *See also Browning v. West Calcasieu Cameron Hosp.*, 03-332 (La.App. 3 Cir. 11/12/03), 865 So.2d 795, *writ denied*, 03-3354 (La. 2/13/04), 867 So.2d 691.

Plaintiffs assert that Mrs. Cloninger died due to the breach of the standard of care by Dr. Walton in either treating or failing to treat Mrs. Cloninger's lung condition. Plaintiffs contend that Mrs. Cloninger was likely septic when discharged, a condition that they assert Dr. Walton should have discovered through reasonable diligence. Plaintiffs argue that Dr. Walton's failure to order further tests, i.e., sputum cultures, blood tests, and chest x-rays, exemplifies a lack of reasonable care or diligence on the part of Dr. Walton.

To support their contention that the lack of diligent testing by Dr. Walton caused Mrs. Cloninger's ultimate demise, Plaintiffs offered into evidence both a written report by and the deposition testimony of Dr. Vlassi Baktidy, a pulmonologist presently licensed and practicing in the areas of pulmonary and critical care in Plainview, New York. In his written report, Dr. Baktidy opined: "I feel, with a reasonable degree of medical certainty that there was significant deviation from the standard of medical care in the management of [Mrs. Cloninger]." However, in his deposition, Dr. Baktidy admitted that the only material he reviewed before rendering his written report in this matter was: (1) Mrs. Cloninger's records from Cabrini

4

Hospital from May 16, 2000 thorough May 19, 2000; (2) Mrs. Cloninger's records from Cabrini Hospital from May 19, 2000 through May 20, 2000, her date of death; and (3) Dr. Walton's deposition. Dr. Baktidy testified as follows:

[BY MR. DALRYMPLE:]

What, in your opinion, as [Mr. Sues] questioned you about in your report, is the most likely cause of [Mrs. Cloninger's] death?

[BY DR. BAKTIDY:]

I think that the sepsis, the presumed sepsis in this patient was a major contributing factor to whatever caused her ultimate cardiopulmonary arrest.

[BY MR. DALRYMPLE:]

Do you think she had pneumonia more likely than not?

[BY DR. BAKTIDY:]

I believe that she had a respiratory infection, probably pneumonia.

However, we find the record devoid of any sufficient and tangible evidence which supports the assertions of Dr. Baktidy and Plaintiffs. Dr. Baktidy's theory is more speculative than definitive.

Plaintiffs contend that Mrs. Cloninger should not have been discharged on May 19, 2000, because her condition was obviously markedly worse than when she was admitted into the hospital on May 16, 2000. Plaintiffs assert that Mrs. Cloninger, for the first time ever while hospitalized, required assistance to perform simple tasks such as bathing, eating and walking; thus, Plaintiffs contend that Dr. Walton's failure to observe this decline in her abilities supports their position that he was lax in his treatment of Mrs. Cloninger. However, the record reflects that Mrs. Cloninger

5

presented to Dr. Perez's office with the assistance of a wheelchair on May 11, 2000 because she felt weak and could not walk, but declined to be admitted to the hospital on that date, only to return and be admitted to the hospital a week later. We also find this argument unpersuasive and insufficient to satisfy Plaintiffs' burden of proof.

Plaintiffs, David Lanningham and Sandra Double, both testified that neither believed their mother's health had improved nor did they believe she had expressed a desire to be discharged; however, neither had personal knowledge of their mother's condition at the time of her discharge on May 19, 2000. The only two family members who were present on the date of discharge, Mrs. Cloninger's husband and another daughter, were not called by Plaintiffs to refute the testimony offered by Drs. Perez and Walton that Mrs. Cloninger's vital signs were stable, her overall condition had improved, and that she had expressed to Dr. Perez her desire to be discharged.

Dr. Walton testified that he had treated Mrs. Cloninger for bronchiectasis since she was diagnosed with the disease in 1998. He stated that because of his familiarity with Mrs. Cloninger's medical history and personal demeanor, he noted an overall improvement in her condition from May 16, 2000 through May 19, 2000 by both objective as well as subjective standards. According to Dr. Walton, Mrs. Cloninger's respiratory distress subsided with the administration of a broad spectrum antibiotic and with the diuresis medication for her edema, as ordered by Dr. Perez. Because of the improvement in her pulmonary condition since being admitted into the hospital on May 16, 2000, Dr. Walton noted on May 19, 2000 that from a pulmonological standpoint, Mrs. Cloninger's condition was acceptable for discharge.

Upon her admission, Dr. Perez stated that Mrs. Cloninger's respiratory rate was 40, an abnormally high rate. He prescribed Levaquin, a broad spectrum antibiotic,

6

for exacerbation of chronic bronchitis. According to Dr. Perez, Mrs. Cloninger's breathing improved during the course of her hospitalization due to the administration of Levaquin; her respiratory rate at discharge was 18. He stated that he did not obtain sputum cultures because of Mrs. Cloninger's positive response to the antibiotic. Because of her edema, Dr. Perez ordered a nephrological consult to rule out nephrotic syndrome and consulted Dr. Walton, a pulmonologist, because Dr. Walton was familiar with Mrs. Cloninger's bronchiectasis. On May 18, 2000, Dr. Perez noted that Mrs. Cloninger's shortness of breath was "better." Dr. Perez also opined that Mrs. Cloninger did not have sepsis at any time during her hospitalization from May 16, 2000 through the date of her discharge, May 19, 2000, nor did he observe that she was in respiratory distress upon her discharge on May 19, 2000.

Dr. William Brooks Emory was called by the defense and was accepted by the trial court as an expert in emergency pulmonary care and internal medicine. Dr. Emory opined that there was no breach in the standard of care in Dr. Walton's treatment of Mrs. Cloninger. From his review of Mrs. Cloninger's medical records from Dr. Perez, Dr. Walton, and Cabrini Hospital, Dr. Emory testified that Mrs. Cloninger's overall condition did improve during her initial hospitalization, and her demise was not a result of the failure of Dr. Walton to meet the applicable standard of care in his treatment of Mrs. Cloninger's lung condition. Dr. Emory stated that Dr. Walton was not required to order further blood tests as suggested by Dr. Baktidy in order to meet the requisite standard of care. Dr. Emory also refuted Dr. Baktidy's opinion that Mrs. Cloninger had sepsis, testifying as follows:

[BY MR. SUES:]

Doctor, what is sepsis?

7

[BY DR. EMORY:]

Sepsis is an inflammatory response by the system to an insult, usually an infected organism or a toxin from an infected organism. It's a body's response to an insult.

[BY MR. SUES:]

In this particular case, did you find any evidence whatsoever that would support a diagnosis of sepsis at any time?

[BY DR. EMORY:]

No, sir.

[BY MR. SUES:]

After this patient was discharged from the hospital, she went home, is that correct?

[BY DR. EMORY:]

That is correct.

[BY MR. SUES:]

And then based on your review of the records, what happened?

[BY DR. EMORY:]

[Mrs. Cloninger] had what is called "sudden death." She had been home several hours. The description that is quoted in the chart is, "[s]he sat bolt upright in bed, rolled her eyes back and stopped breathing." That's called a "sudden death."

The record further reflects that Mrs. Cloninger was admitted and discharged upon the instruction of her primary treating physician, Dr. Perez, not Dr. Walton. Therefore, Plaintiffs' claim of wrongful discharge against Dr. Walton is misplaced.

After a *de novo* review of the record, despite the trial court's misapplication of the requisite burden of proof in this medical malpractice action, we conclude that

8

Plaintiffs failed to satisfy their burden of proving, by a preponderance of the evidence, that Dr. Walton breached the applicable standard of care in his treatment of Mrs. Cloninger.

## DECREE

For the foregoing reasons, the judgment of the trial court in favor of Defendant, Dr. Benjamin F. Walton, is affirmed. Costs of this appeal are assessed against Plaintiffs/Appellants, David Lanningham and Sandra Double.

**AFFIRMED.**