# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

## 10-0278


**MARGIE MCGLOTHLIN, ET AL.**

**VERSUS**

**CHRISTUS ST. PATRICK HOSPITAL**


************

APPEAL FROM THE
FOURTEENTH JUDICIAL DISTRICT COURT
PARISH OF CALCASIEU, NO. 2005-4108 DIV. "A"
HONORABLE KENT SAVOIE, DISTRICT JUDGE

************

## JIMMIE C. PETERS
## JUDGE

************

Court composed of Jimmie C. Peters, Marc T. Amy, Elizabeth A. Pickett, Billy H. Ezell, and Shannon J. Gremillion, Judges.


**REVERSED AND RENDERED.**


**Gremillion, J., concurs in part, dissents in part, and assigns written reasons.**

**Kenneth Michael Wright**
**Attorney at Law**
**203 W. Clarence Street**
**Lake Charles, LA 70601**
**(337) 439-6930**
**Vincent J. DeSalvo**
**Attorney at Law**
**7918 Wrenwood Blvd., Suite A**
**Baton Rouge, LA 70809**
**(225) 927-7035**
**COUNSEL FOR PLAINTIFFS/APPELLANTS:**
    **Margie McGlothlin**
    **John McGlothlin**

**Benjamin J. Guilbeau, Jr.**
**Stockwell, Sievert, Viccellio, Clements & Shaddock, L.L.P.**
**Post Office Box 2900**
**Lake Charles, LA 70602**
**COUNSEL FOR DEFENDANT/APPELLEE:**
    **Christus St. Patrick Hospital**

PETERS, J.

The plaintiffs in this medical malpractice case, Margie McGlothlin and her husband, John McGlothlin, appeal a jury verdict rejecting their claims for damages asserted against the defendant, Christus St. Patrick Hospital. For the following reasons, we reverse the trial court judgment and render judgment in favor of the McGlothlins.

### DISCUSSION OF THE RECORD

This litigation has as its origin complications arising from a bilateral total knee replacement surgery that was performed by Dr. Lynn Edward Foret, a Lake Charles, Louisiana, orthopaedic surgeon, at Christus St. Patrick Hospital in Lake Charles on May 17, 1999. Dr. Foret had begun treating Mrs. McGlothlin for osteoarthritis in both knees in 1991 and, after conservative treatment proved unsuccessful, he recommended that both knees be replaced.

The surgery was successful, and Mrs. McGlothlin's initial recovery uneventful. Three days after surgery, Dr. Foret issued orders transferring Mrs. McGlothlin from the main hospital to its rehabilitation section. While in the rehabilitation section, Mrs. McGlothlin sustained a dislocation of her left kneecap. Thereafter, she underwent significant medical treatment to address the dislocation and complications arising therefrom. The specific cause of the dislocation of the kneecap is the underlying issue in this litigation.

The McGlothlins first submitted their claims for damages to a medical review panel empaneled pursuant to La.R.S. 40:1299.47, and, in a June 13, 2005 opinion, the panel rejected their claims. The instant suit followed the release of that opinion, and in their pleadings, the McGlothlins assert two separate events that they claim were the cause of the dislocation Mrs. McGlothlin suffered.

The McGlothlins assert that the first event occurred on May 20, 1999, during Mrs. McGlothlin's move from the main hospital to the rehabilitation section. They claim that when the nurse assistant attempted to transfer Mrs. McGlothlin from her wheelchair to her bed, she "half-dropped" her, injuring her left knee. The second event giving rise to this litigation is purported to have occurred on May 28, 1999,[1] as another nursing assistant helped Mrs. McGlothlin transfer from her wheelchair to a toilet with a seat riser. They assert that during the transfer process, Mrs. McGlothlin fell to the bathroom floor and injured her left knee. In both events, the McGlothlins assert that the nurse assistant attempted to transfer Mrs. McGlothlin without the assistance of anyone else. Mrs. McGlothlin claims these events caused the dislocation.

It is not disputed that Mrs. McGlothlin sustained a kneecap dislocation while under the care, custody, and control of the hospital; she was under the hospital's care, custody, and control at the time both instances are alleged to have occurred; the nurse assistants involved in the alleged transfers were employees of Christus St. Patrick Hospital; and the standard of care applicable to the movement of a double knee replacement patient from a wheelchair to a bed or toilet requires the coordination of that effort with more than one trained individual. By way of defense, however, the hospital denied that either of the two events occurred as alleged by the McGlothlins and suggested that the dislocated kneecap resulted from physical therapy, not a violation of the applicable standard of care in moving a patient from a wheelchair to a bed or toilet.

---

[1] In their pleadings the McGlothlins assert that the second incident occurred on May 29, 1999. However, at trial the McGlothlins raised the issue of whether the incident occurred on May 28, 1999, without objection by Christus St. Patrick Hospital, in such a manner as to expand the pleadings to include May 28, 1999. La.Code Civ.P. art. 1154.

2

The three-day jury trial on the merits began on June 16, 2009, and resulted in a verdict in favor of Christus St. Patrick Hospital. After the trial court entered a judgment in accordance with the jury verdict, the McGlothlins perfected this appeal, asserting four assignments of error:

1.  The Medical Review Panel is inadmissible in evidence and the District Court erred in editing the Panel opinion and admitting the edited Panel opinion in evidence.

2.  The District Court erred in prohibiting cross-examination of defense expert, Dr. Lee Leonard, on the issue of the Medical Review Panel's determination of credibility.

3.  A reasonable factual basis does not exist for the jury's finding of no liability.

4.  What quantum of damages will adequately compensate Margie McGlothlin for her injuries?

**OPINION**

***Assignment of Error Number One***

In their first assignment of error, the McGlothlins argue that the trial court erred in admitting an edited version of the medical review panel opinion into evidence and that this error requires this court to undergo a *de novo* review of the jury's decision. We agree.

This issue arose because, on the second day of trial, the McGlothlins filed a motion *in limine* seeking to prohibit the introduction of the medical review panel opinion. In their motion, they argued that the panel's opinion was based on its determination of a material issue of fact, not requiring an expert opinion, which violates its statutory mandate as provided in La.R.S. 40:1299.47(G). The trial court agreed that the medical review panel had overstepped its statutory authority, but

3

instead of rejecting the opinion in its entirety, attempted to delete certain language in the opinion to cure the admissibility problem created by the statutory violation.

Louisiana Revised Statutes 40:1299(H) provides in part that "[a]ny report of the expert opinion reached by the medical review panel *shall* be admissible as evidence in any action subsequently brought by the claimant in a court of law." (Emphasis added.) However, with regard to what the medical review panel's opinion should address, La.R.S. 40:1299.47(G) provides:

> The panel *shall have the sole duty to express its expert opinion as to whether or not the evidence supports the conclusion that the defendant or defendants acted or failed to act within the appropriate standards of care*. After reviewing all evidence and after any examination of the panel by counsel representing either party, the panel *shall*, within thirty days, *render one or more of the following expert opinions,* which shall be in writing and signed by the panelists, together with written reasons for their conclusions:
>
> (1) The evidence supports the conclusion that the defendant or defendants failed to comply with the appropriate standard of care as charged in the complaint.
>
> (2) The evidence does not support the conclusion that the defendant or defendants failed to meet the applicable standard of care as charged in the complaint.
>
> (3) *That there is a material issue of fact, not requiring expert opinion, bearing on liability for consideration by the court.*
>
> (4) When Paragraph (1) of this subsection is answered in the affirmative, that the conduct complained of was or was not a factor of the resultant damages. If such conduct was a factor, whether the plaintiff suffered: (a) any disability and the extent and duration of the disability, and (b) any permanent impairment and the percentage of the impairment.

(Emphasis added.)

In its June 13, 2005 opinion, the medical review panel unanimously concluded that "[t]he evidence does not support the conclusion that the defendant, *Christus St. Patrick Hospital*, failed to comply with the appropriate standard of care as charged

in the complaint." It then followed this conclusion with written reasons supporting this conclusion that state as follows:

> The post-surgery patella dislocation and infection are known complications of this procedure, and could have occurred without any negligence on the part of the hospital. The patient and her family allege that two incidents occurred involving hospital staff that caused a twisting injury and an acute flexation injury, damaging the total knee arthroplasty, resulting in a dislocated patella. However, the LPN alleged to be involved in the initial incident on May 20, 1999, upon admit to the rehab unit, emphatically denies that any incident occurred; the alleged incident was not documented in the hospital records at the time of the occurrence; no contemporaneous Incident Report was filed; the patient did not report the incident to the P.A. the following morning; and the patient attended physical therapy for several days thereafter with progress being noted. On May 28, 1999, an x-ray was ordered which showed lateral displacement of the left kneecap, possibly due to rotation or true lateral displacement, but the patient and her family allege that the second incident occurred in the bathroom on May 29, 1999, a day later. Once again, the CNA alleged to be involved in the second incident emphatically denies that any incident occurred, the alleged incident was not documented in the hospital records at the time of occurrence, and no contemporaneous Incident Report was filed. The follow-up x-rays of May 31, 1999, and June 1, 1999, do indicate that lateral displacement was occurring, but *we feel that the versions of both of the incidents, by the patient and her family, appear to have numerous inconsistencies.*

(Emphasis added.)

On the surface, this opinion *seems* to comply with the statutory mandate of La.R.S. 40:1299.47(G) in that it reaches the conclusion provided for in La.R.S. 40:1299.47(G)(2) and provides written reasons. However, a closer examination of the written reasons leads to only one conclusion—that the medical review panel reached its opinion only by resolving material issues of fact which did not require an expert opinion. Simply stated, a medical review panel cannot return a conclusion on the breach of standard of care issue provided for by either La.R.S. 40:1299.47(G)(1) or (G)(2) if unresolved material issues of fact exist on that issue that do not require

5

an expert opinion for resolution and that bear on the question of liability.[2] *Whittington v. Savoy*, 05-1169 (La.App. 3 Cir. 5/31/06), 931 So.2d 1198.

In the matter now before us, the medical review panel found no violation of the applicable standard of care without even stating what that standard of care is. Instead, the panel's written reasons addressed only the factual conflicts raised by the information before it. Furthermore, as was established by the testimony of Glenda Joiner Rogers, a Georgetown, Texas registered nurse and clinical nurse specialist who teaches nursing at the University of Texas, the applicable standard of care was hardly an issue. According to Ms. Rogers, the standard of care applicable to the transfer from wheelchair to either bed or toilet of a patient weighing almost 300 pounds[3] required that there be two people assisting in the transfer with the use of a "gait belt"[4] around the patient's waist. Not only did Christus St. Patrick Hospital not dispute this standard as being applicable to this litigation, but its witnesses agreed with Ms. Rogers' assessment.

This court in *Whittington*, 931 So.2d 1198, held that the statutory authority of La.R.S. 40:1299.47(H), which allows the admissibility of the medical review panel

---

[2]We recognize that La.R.S. 40:1299.47(G) provides that the medical review panel may "render one or more" of the three available opinions provided for in the statute. However, that provision applies in cases like *Allen v. Baton Rouge Gen. Med. Ctr./Gen. Health Sys.*, 09-1110, p. 2 (La.App. 1 Cir. 12/23/09), 30 So.3d 127, 128-29, *writ denied*, 10-195 (La. 4/5/10), 31 So.3d 368, where the medical review panel was examining complaints against both a medical center and a doctor and found that as to the medical center "[t]here is a material issue of fact, not requiring expert opinion, bearing on liability for consideration by the Court," while it found that as to the doctor "[t]he evidence supports the conclusion that Dr. Lenahan failed to comply with the appropriate standard of care as charged in the Complaint." When only one health care provider's actions are under review, it would be totally inconsistent to allow the panel to reach a conclusion on the standard of care issue and, at the same time, return an opinion stating that material issues of fact still remain unresolved on that same issue.

[3]Mrs. McGlothlin was excessively overweight.

[4]A gait belt is a belt that placed around a patient's waist which the nurses can hold onto as they transfer a patient, for example from a wheelchair to a bed.

opinion, "presupposes the validity of the opinion itself." *Whittington*, 931 So.2d at 1201.[5] In a situation almost identical to the one now before us, the *Whittington* court concluded that an opinion rendered on the merits in violation of La.R.S. 40:1299.47(G) was not admissible. We agree with that rationale and find that the medical review panel opinion in the matter before us was not admissible into evidence. Furthermore, we find that the trial court did not cure the admissibility problem by deleting certain language from the opinion.

Specifically, the trial court deleted the medical review panel's conclusion as well as part of the last sentence, which states "but we feel that the versions of both of the incidents by the patient and her family appear to have numerous inconsistencies." However, a clear reading of what remains of the medical review panel's opinion establishes to the reader that the underlying dispute was factual and not legal.

The error is made more grievous because of the testimony on behalf of the hospital by Dr. Lee Leonard, a Lafayette, Louisiana orthopedic surgeon who served as a member of the medical review panel. In ruling that portions of the medical review panel's opinion were not admissible, the trial court also ruled that Dr. Leonard would not be allowed to state what the panel's conclusion was. However, Dr. Leonard made it clear in his testimony that his opinion and that of the panel were based on factual findings. Although Dr. Leonard testified that it was his opinion that there was no evidence of a breach in the standard of care on the part of the hospital, Dr. Leonard never stated what the applicable standard of care was. He testified that a patella dislocation could occur during rehabilitation, without there being any fault

---

[5]We note that this holding represents a split from our brethren in the second circuit, who have held that the language of La.R.S. 40:1299.47(H) makes the medical review panel's opinion admissible even if the panel improperly rendered an opinion on the merits when there was a material issue of fact bearing on liability that did not require an expert opinion. *Hunter v. Bossier Med. Center*, 31,026 (La.App. 2 Cir. 9/25/98), 718 So.2d 636.

on the part of the hospital employees, and that he did not find any evidence of anyone's fault in causing the patella dislocation. Thus, despite the trial court's attempt to redact the offensive language to cure the medical review panel's violation of its statutory mandate, the jury became fully informed concerning how the panel's opinion was reached and that it had found Christus St. Patrick Hospital did not violate the standard of care.

Having found that the trial court erred in allowing the jury to consider a redacted version of the medical review panel's opinion, we must next consider the effect of that error on our scope of review. The general rule is that whether a health care provider's conduct falls below the applicable standard of care is a factual determination that is subject to the manifest error standard of review. *Curtis v. Columbia Doctors' Hosp. of Opelousas*, 03-916 (La.App. 3 Cir. 12/17/03), 862 So.2d 1125. However, "[w]hen the jury is tainted by incorrect and prejudicial instructions or rulings on admissibility of evidence in a tort case, the jury's liability decision is not entitled to any deference, and the appellate court decides the case on the record without according any weight to the jury's liability decision." *Andrus v. State Farm Mut. Auto. Ins. Co.*, 95-801, p. 10 (La. 3/22/96), 670 So.2d 1206, 1211. Legal errors are considered prejudicial when they materially affect the outcome of the litigation. *Lanningham v. Walton*, 06-1103 (La.App. 3 Cir. 2/7/07), 950 So.2d 922. When such an error occurs, the appellate court will, if possible, apply the correct principles of law, determine the material facts, and render a proper judgment on the record. *Id.* In this case, we find that the trial court's erroneous admission of the medical review panel's redacted opinion and Dr. Leonard's direct testimony concerning the inner workings of the panel tainted the integrity of the trial, and accordingly we will review

8

the record *de novo*. *Ernst v. Taylor*, 08-1289 (La.App. 3 Cir. 5/6/09), 17 So.3d 981, *writ denied*, 09-1262 (La. 9/18/09), 17 So.3d 977.

### *Assignment of Error Number Two*

Because we find that the trial court erred in admitting the medical review panel's opinion, we need not address the McGlothlins' second assignment of error.

### *Assignment of Error Number Three*

In their third assignment of error, the McGlothlins seek reversal of the jury's judgment that Christus St. Patrick Hospital was not liable for their injuries. Based on our *de novo* review, we find merit in this assignment of error.

The McGlothlins' allegations of liability on the part of Christus St. Patrick Hospital are based on their claims of negligence by two of the hospital's certified nurse assistants. It is well established that under the doctrine of *respondeat superior* a hospital can be liable for the negligence of its employees. *Odom v. State Dep't of Health and Hosps.*, 98-1590 (La.App. 3 Cir. 3/24/99), 733 So.2d 91; *Little v. Pou*, 42,872 (La.App. 2 Cir. 1/30/08), 975 So.2d 666, *writ denied*, 08-806 (La. 6/6/08), 983 So.2d 920. To meet their burden of proving medical malpractice by a nurse, the plaintiffs must prove the applicable standard of care, that the nurse breached that standard, and that the substandard care caused an injury that the plaintiffs would not have otherwise suffered. La.R.S. 9:2794; *Donaldson v. Sanders*, 94-1366 (La.App. 3 Cir. 7/19/95), 661 So.2d 1010, *writ granted*, 95-2940 (La. 2/28/96), 668 So.2d 363. A nurse's duty is to exercise the degree of skill ordinarily employed, under similar circumstances, by members of the nursing profession in good standing in the same community or location, and to use reasonable care and diligence, along with his or her best judgment, in the application of his or her skill to the case. *Odom*, 733 So.2d 91.

9

As previously stated, Ms. Rogers established the proper standard of care applicable to this litigation: The transfer from wheelchair to either bed or toilet of a bilateral knee replacement patient weighing almost 300 pounds requires at least two people assisting in the transfer together with the use of a gait belt.[6] Whether the hospital employees breached that standard of care, and whether that breach caused Mrs. McGlothlin's dislocated kneecap are questions of fact. *Hypolite v. Columbia Dauterive Hosp.*, 07-357 (La.App. 3 Cir. 10/3/07), 968 So.2d 239; and *see Sepulvado v. Toledo Nursing Center, Inc.*, 07-122 (La.App. 3 Cir. 5/30/07), 958 So.2d 135, *writ denied*, 07-1583 (La. 10/12/07), 965 So.2d 406; and *Squyres v. Our Lady of Lourdes Reg'l Med. Ctr., Inc.*, 06-1517 (La.App. 3 Cir. 4/4/07), 954 So.2d 897. As the McGlothlins assert two events gave rise to Mrs. McGlothlin's injuries, we will consider them separately.

### May 20, 1999 Incident

The factual record establishes that Connie George,[7] a certified nurse assistant, moved Mrs. McGlothlin by wheelchair from the postoperative floor of the hospital to its rehabilitation section on May 20, 1999. Mrs. McGlothlin and three other family member witnesses[8] testified that Ms. George's hands slipped as she attempted to lift Mrs. McGlothlin from the wheelchair to the bed and that Mrs. McGlothlin almost fell to the floor. Not only did Ms. George dispute the particulars of the transfer, but she

---

[6]Ms. Rogers also suggested that the transfer from the wheelchair to a toilet seat should have been accomplished with the use of a locked toilet seat extender as well, and that in any case, a walker would be helpful.

[7]Ms. George has married since the events in 1999; her full name is now Connie George Eaglin. However, for consistency with the other witnesses' testimony, we will refer to her as Ms. George throughout the opinion.

[8]The individuals whom the witnesses claim to have been present at the transfer from the wheelchair to the bed include Mr. McGlothlin; two daughters, Genevieve Marks and Margie Marie Beckworth; and one granddaughter, Flavia Marie McGlothlin. Ms. Beckworth did not testify at the trial.

10

testified that none of the family members were even present during the transfer. According to Ms. George, she asked Mrs. McGlothlin if she wanted to be transferred to the bed upon their arrival at the rehabilitation section's room, but Mrs. McGlothlin informed her that she would like to sit up for a while. Ms. George testified that she left Mrs. McGlothlin sitting in the wheelchair and that she had no further contact with the patient.[9]

We need not resolve the factual dispute with regard to this particular incident because, even assuming that the McGlothlins carried their burden of proof on the breach issue, the record does not support a finding of causation. The medical records of the following day reflect that at 7:30 a.m. Mrs. McGlothlin was "awake, alert, and oriented," with no complaints of discomfort or distress noted, and Mrs. McGlothlin acknowledged in her testimony that between May 21 and May 27, 1999, she made positive progress in her recovery. According to Mrs. McGlothlin, after two or three days her left knee started feeling better and, although she continued to use pain medication, she also continued to progress through her rehabilitation. Her rehabilitation records reflect that she seemed to make daily progress.

Finding that the McGlothlins failed to prove the element of causation, we hold they failed to prove their claim for damages arising from the May 20, 1999 incident by a preponderance of the evidence.

## May 28, 1999 Incident

The McGlothlins claim that on May 28, 1999, certified nursing assistant Peggy White took Mrs. McGlothlin to a bathroom in the rehabilitation facility and, while transferring Mrs. McGlothlin from her wheelchair to a toilet with a seat riser, allowed

---

[9]Ms. George testified that it would have been a breach of the standard of care applicable to nurses and nurse assistants had she attempted to lift Mrs. McGlothlin by herself.

Mrs. McGlothlin to fall from her wheelchair. According to Mrs. McGlothlin, the seat riser, which was not properly fastened, gave way, causing her to fall. She claims she suffered immediate and intense pain in her left knee. Dislocation of Mrs. McGlothlin's left kneecap was confirmed that same day by an x-ray taken at Dr. Foret's instruction.

Mrs. McGlothlin testified that Ms. White took her in her wheelchair to use the rehabilitation bathroom, placed the wheelchair on the side of the commode, and placed the plastic seat riser onto the commode without latching the riser to the commode. According to Mrs. McGlothlin, Ms. White then stood on one side of her and lifted her up under her left arm, while she (Mrs. McGlothlin) held onto the wheelchair with her other arm. After Ms. White had lifted Mrs. McGlothlin partially up, and Mrs. McGlothlin was beginning to sit on the riser, the riser moved and Mrs. McGlothlin fell. According to Mrs. McGlothlin, her left knee bent as she went to the floor. Mrs. McGlothlin testified that Ms. White assisted her back into the wheelchair, but that her left knee was already swelling and painful. She asked Ms. White to return her to her room. When she returned to her room, Mrs. McGlothlin immediately telephoned both her husband and Dr. Foret to report the fall. According to Mrs. McGlothlin, Dr. Foret came to her room soon thereafter and ordered an x-ray.

Ms. White testified that not only did the bathroom incident not occur, but that there had never been an incident in which Mrs. McGlothlin sustained any injuries while under her care.

Dr. Foret testified that on May 28, 1999, and after receiving a complaint from Mrs. McGlothlin that she had injured her knee in the bathroom, he ordered an x-ray of Mrs. McGlothlin's left knee. According to Dr. Foret, Mrs. McGlothlin told him

12

that she had been in the bathroom with an aide trying to get her up when her knee went to the side. The x-ray was taken the same day, and a radiologist's subsequent report revealed that there was a possible lateral patella displacement; that is to say, the kneecap had become displaced.

Dr. Foret testified that a displaced patella is usually caused when the patient's foot slips to the side and a valgus angle is created, so that the kneecap goes to the outside. According to Dr. Foret, the danger of this kind of injury is one of the reasons that a patient who is recovering from knee replacement surgery is transported by multiple people to try to maintain stability of the knee. The doctor also noted that, in the case of Mrs. McGlothlin, this extra assistance was made even more important by the patient's obesity. He described the injury to Mrs. McGlothlin's kneecap as completely consistent with the accident she described to him on May 28, 1999. He noted that while setbacks in rehabilitation occur regularly from knee pain, weakness, or bursitis setting in, "a trauma event is when the kneecap would dislocate."

The hospital first argues that Mrs. McGlothlin's kneecap became dislocated as a result of activities during rehabilitation on May 28, 1999, and without any negligence on the part of hospital employees.[10] However, nothing in the medical records suggests that any traumatic event occurred during rehabilitation therapy to injure her knee. On the other hand, Mrs. McGlothlin's medical records do confirm that something occurred on May 28, 1999, that reversed the rehabilitation progress of the past few days. The occupational therapy assessment for the period of May 27 through June 2, 1999, contained a notation that on May 28, Mrs. McGlothlin was able to stand for five minutes before she began complaints of pain, and that rehabilitation

---

[10]Dr. Leonard testified that it was possible for a patella dislocation to occur in rehabilitation without there being any fault on the part of the rehabilitation workers.

activities had been placed on hold "since problems with knee have risen."[11]  Debra

Loftin, a registered nurse who was working as the administrator of the rehabilitation

unit in May of 1999, interpreted this report to mean that "the pain was starting to

inhibit her mobility . . . on rehab," and that Mrs. McGlothlin's left knee symptoms

took a turn for the worse on Friday, May 28, 1999.

Additionally, Ms. Loftin had prepared an incident report on July 14, 1999, that

stated:

> Patient states that on May 20th, when a nurse aide from Unit 51
> brought her down to rehab, she twisted her knee getting into bed.
> Patient further states that on May 29th, when she was assisted to the
> toilet in her room, the elevated toilet seat slipped and she twisted her left
> knee, which was painful.

When asked about the source of this information, Ms. Loftin stated "I would think the

patient had already told me and the incident report had not been completed yet; and,

so, they had requested that I complete the incident report."

The hospital also argues that if the incident in the bathroom described by Mrs.

McGlothlin did occur, it took place on June 2, 1999, after her kneecap had already

been dislocated.  The hospital based this argument on three "markers" given by Mrs.

McGlothlin's testimony, which would establish the day the incident in the bathroom

took place: crying in bed, calling Dr. Foret, and being given morphine.  A note in

Mrs. McGlothlin's medical records shows that on June 2, at 1:45 p.m., she was crying

in her room, complaining of pain, and that at 2:00 p.m. Dr. Foret saw Mrs.

---

[11]The second page of the assessment report is not in the record, the report itself is not dated, and there is no evidence of the time of the assessment.  The report itself reads as follows:

> Patient able to tolerate standing up to ~ 5 minutes on Friday before c/o pain to (L)
> knee began.  Patient able to perform transfer on/off BSC w/ mod (I) -SBA.  Toilets
> w/ SBA.  Dresses LE w/ SBA using A/E.  Patient continues to perform UE exercises
> at bedside since problems w/ (L) knee have arisen.  Will await further orders to
> continue.

McGlothlin and ordered morphine for her. Ms. Haley testified that the medical records show that June 2 was the first day that Mrs. McGlothlin received morphine while in the rehabilitation unit. However, this analysis ignores the fact that Dr. Foret testified that he received an injury report on May 28; ignores the results of the x-ray taken on May 28; and disregards the fact that Mrs. McGlothlin's knee was x-rayed on May 28, but not on June 2.

The hospital's medical records reflect clearly that Mrs. McGlothlin was consistent and immediate in her complaints about her treatment on both May 20 and May 28. The same Debra Loftin who completed the July 14, 1999 incident report had made an entry in Mrs. McGlothlin's records on May 21, 1999, concerning the patient's complaint involving the transfer the day before. The entry notes that "[p]atient complains. Yesterday when that aide from the other floor brought me down, she twisted my knee getting me into bed."[12] Mrs. McGlothlin's complaints also appear in a hospital quality assurance committee variance report dated July 14, 1999. That report contained a notation that "Pt states that on May 20, when a nurse aide from U51 brought her down to rehab, she twisted her knee getting into bed. Pt further states that on May 29 when she was assisted to the toilet (in her room) the elevated toilet seat slipped [illegible] she twisted her lt knee, which was painful."[13]

Despite Dr. Foret's description of a kneecap displacement as a traumatic event, those employees of the hospital responsible for investigation of patient complaints seem to automatically resolve the complaints as unfounded if they found no *record*

_____

[12]We note that Carroll Boudreaux, a registered nurse, recorded no complaints from Mrs. McGlothlin or her family in his initial assessment report when Mrs. McGlothlin first came to the rehabilitation unit on May 20, 1999. However, Mr. Broudreaux had no independent recollection of the review and there is no evidence concerning when or where the review was performed.

[13]It is unclear from the record whether these comments were derived from Mrs. McGlothlin after the two incidences at issue or taken from hospital records.

15

of a contemporaneous complaint.  This approach ignores the obvious with regard to the May 28 incident—a traumatic event occurred resulting in Mrs. McGlothlin's kneecap becoming dislocated.  Absent a showing of any other possible cause, Mrs. McGlothlin's account has credibility.

Reviewing the entire record *de novo*, we conclude that the McGlothlins carried their burden of establishing that on one occasion, May 28, 1999, a hospital employee breached her duty of the care due to Mrs. McGlothlin when she attempted to transfer Mrs. McGlothlin without assistance, and that this breach resulted in an injury to Mrs. McGlothlin's left knee.

### *Assignment of Error Number Four*

In their final assignment of error, the McGlothlins seek damages for the injuries they suffered.  Dr. Foret performed surgery on July 15, 1999, to correct the kneecap displacement.  In doing so, he discovered that the retinaculum, the connecting band that holds the kneecap in place, was completely torn.  After this surgery, Dr. Foret asked Dr. Carlos M. Choucino, a Lake Charles, Louisiana, infectious disease specialist, to follow Mrs. McGlothlin because he was concerned about possible infections.  In a consultation report dated July 29, 1999, Dr. Choucino related to Dr. Foret that he had discovered an extremely rare bacteria in Mrs. McGlothlin's left knee - stenotrophomonas maltophilia.  Dr. Choucino began treating Mrs. McGlothlin with a combination of several antibiotics, and she convalesced until October of 1999. However, on October 18, 1999, biopsies taken by Dr. Foret revealed a staph infection in Mrs. McGlothlin's left knee.

On October 21, 1999, Dr. Foret inserted a Jackson Pratt drain in Mrs. McGlothlin's left knee in an effort to eliminate the infection without having to

16

remove the entire joint. On October 25, 1999, Dr. Foret replaced the Jackson Pratt drain. However, Mrs. McGlothlin's problems persisted and, on January 18, 2000, Dr. Foret bought Mrs. McGlothlin back into surgery and opened up both sides of the knee to obtain in an effort to see if there was an infection in both components of the knee. Dr. Foret repeated his search for infection on March 2, 2000, when he made incisions in the four quadrants of Mrs. McGlothlin's left knee joint to drain the knee and to take additional cultures. All of these procedures took place in the operating room, with Mrs. McGlothlin under general anesthesia.

At one point, while fighting these infections, Mrs. McGlothlin's kidneys failed and she had to undergo three dialysis treatments. Dr. Foret ultimately decided that the infection in the joint could not be resolved, and on July 17, 2000, he removed the artificial knee from her left leg, leaving her able to only partially bend her left leg. Mrs. McGlothlin remained in the hospital after that surgery until July 26, 2000. On August 10, 2000, Dr. Foret performed another operation, during which he found dead tissue inside Mrs. McGlothlin's left knee joint and cleaned out the joint in an effort to prevent further infection.

Dr. Foret testified that Mrs. McGlothlin can bend her left leg only slightly; she is unable to walk; and she is confined to her bed and her wheelchair. According to the doctor, there is no expectation that her condition will ever change.

Mrs. McGlothlin testified that since the removal of the artificial knee joint in July of 2000 she cannot dress herself and can only walk a short distance – perhaps ten feet – on her walker. She was dependent on a catheter for twenty-seven months after Dr. Foret removed the artificial knee joint in July of 2000, and at the time of trial had to have a catheter inserted any time she leaves home. She testified that her knee hurts

17

constantly, that her pain is not relieved by medication, and the only place she goes is to the doctor. Mrs. McGlothlin testified that she cries all day because she cannot use her left leg; she is depressed and takes medication for depression.

Mr. McGlothlin testified that he retired from his cross-country truck driving career in 1999 to take care of his wife. When Mrs. McGlothlin was initially released from the hospital, one of their daughters moved in with them for six months to help care for her mother. After the daughter moved out of the home, Mr. McGlothlin has been the primary caretaker and assists her with all of her daily living chores. According to Mr. McGlothlin, since the infections began, his wife has expressed that she is in constant pain.

While acknowledging that the subsequent infections may have occurred regardless of the July 15, 1999 surgery, Dr. Foret testified that it was more probable than not that the infections came about as a result of the patella revision surgery on July 15. He noted that there was no sign of infection immediately after the knee replacement surgery, and were they to relate to that surgery, he would have expected symptoms of the infection to have appeared earlier. Dr. Leonard testified that the infections could have arisen from the May 17, 1999 surgery, but he could not be sure whether they developed from the first or subsequent surgeries. He did agree, however, that the risk of infections increases when there are additional surgeries.

Based on the evidence presented at trial, we find that the McGlothlins established the hospital's liability for both the displaced patella and the series of infections.

Because we are making an initial award of damages, not reviewing an award made by the trial court, we are not limited by a determination of either the lowest or

18

highest amount that should be affirmed. *Broussard v. Med. Protective Co.*, 06-331(La.App. 3 Cir. 2/21/07), 952 So.2d 813. Rather, we base the amount of damages on what the record reveals is just compensation. *Id.* However, the McGlothlins' claims for damages are governed by the Medical Malpractice Act, La.R.S. 40:1299.41-1299.49, which limits recovery by medical malpractice victims who have been injured by qualified health care providers as follows: "The total amount recoverable for all malpractice claims for injuries to or death of a patient, exclusive of future medical care and related benefits as provided in R.S. 40:1299.43, shall not exceed five hundred thousand dollars plus interest and cost." La.R.S. 40:1299.42(B)(1).

### Medical Expenses

Medical care and related benefits as provided for in La.R.S. 40:1299.42(B)(1) include all reasonable medical treatment incurred after the date of the injury until the date of the judgment and reasonable medical treatment that will be incurred after the date of the judgment. La.R.S. 40:1299.43(B) and (D). At trial the parties stipulated that the medical expenses incurred through the date of trial totaled $64,815.41. However, this included $2,474.12 for expenses of the May 17, 1999 double knee replacement surgery and its attendant rehabilitation, neither of which were caused by the hospital employees' negligence. Accordingly, we reduce the stipulated amount to $62,341.29. Thus, we find that the McGlothlins are entitled to an award of $62,341.29 in special damages for past medical expenses, and for the expenses of reasonable medical treatment that will be incurred after the date of the trial court judgment.

***General Damages***

"General damages are those which are inherently speculative in nature and cannot be fixed with mathematical certainty." *Miller v. LAMMICO*, 07-1352, p. 27 (La. 1/16/08), 973 So.2d 693, 711. General damages can include an award for mental or physical pain and suffering and loss of enjoyment of life. *Id*. Mr. McGlothlin also seeks damages for his loss of consortium. The compensable elements of damage in a claim for loss of consortium of a spouse include loss of love and affection, loss of companionship, loss of material services, loss of support, impairment of sexual relations, loss of aid and assistance, and loss of felicity. *Ferrell v. Fireman's Fund Ins. Co.*, 96-3028 (La. 7/1/97), 696 So.2d 569. Mr. McGlothlin's claim for damages for loss of consortium arises under La.Civ.Code art. 2315 and is a separate cause of action from his wife's claim. *McGee v. A C And S, Inc.*, 05-1036 (La. 7/10/06), 933 So.2d 770.

However, even though Mr. McGlothlin's loss of consortium claim is a separate cause of action, under the Medical Malpractice Act that applies to private health care providers, La.R.S. 40:1299.41-1299.49, his loss of consortium claim is combined with Mrs. McGlothlin's medical malpractice claim for purposes of the $500,000.00 statutory cap in La.R.S. 40:1299.42(B)(1). Under these statutes, which apply to all private health care providers, only Mrs. McGlothlin is considered a "patient."[14] Louisiana Revised Statutes 40:1299.41(A)(15) defines "patient" as "a natural person, including a donor of human blood or blood components and a nursing home resident

---

[14] Although only Mrs. McGlothlin is considered a "patient," both she and Mr. McGlothlin together are considered to be one "claimant." Louisiana Revised Statutes 40:1299.41(A)(4) defines a "claimant" as "a patient or representative or any person including decedent's estate, seeking or who has sought recovery of damages or future medical care and related benefits under this part," and provides that "[a]ll persons claiming to have sustained damages as a result of injuries to or death of any one patient are considered a single claimant."

20

who receives or should have received health care from a licensed health care provider, under contract, expressed or implied." Under La.R.S. 40:1299.42(B)(1) (emphasis added), "[t]he total amount recoverable for *all malpractice claims for injuries to or death of a patient . . .* shall not exceed five hundred thousand dollars plus interest and cost." Since here only Mrs. McGlothlin is considered a patient, and Mr. McGlothlin's claim for loss of consortium is a derivative of her malpractice claim, their claims are combined for purposes of the $500,000.00 statutory cap.

In reaching this conclusion, we note that a different definition of "patient" is given in La.R.S. 40:1299.39-1299.39.3, which govern the malpractice liability for state health care providers. There a patient is defined as "a natural person who receives, or should have received, health care from a person covered by this Part *and any other natural person or persons who would or may have a claim or claims for damages under applicable law arising out of, or directly related to, the claim or claims of the natural person* who receives, or should have received, health care from a person covered by this Part." La.R.S. 40:1299.39(A)(3) (emphasis added). Under that definition of "patient," Mr. McGlothlin might also be considered a patient, and thus his consortium claim would be subject to a separate $500,000.00 statutory cap. *See dissent in Hollingsworth v. Bowers*, 96-257 (La.App. 3 Cir. 12/30/96), 690 So.2d 825.

Considering the length of time that Mrs. McGlothlin suffered debilitating surgeries and hospitalizations; the extent of her current incapacity, which has no hope of improving; and the impact these injuries have had on Mr. McGlothlin's life, we find that her pain and suffering and loss of enjoyment of life and Mr. McGlothlin's

21

loss of consortium far exceed the statutory cap of $500,000.00, and accordingly award the McGlothlins the statutory maximum of $500.000.00.

## DISPOSITION

For the foregoing reasons, we reverse the trial court's judgment dismissing the claims of Margie McGlothlin and John McGlothlin and render judgment in their favor and against Christus St. Patrick Hospital in the amount of $500,000.00, inclusive of the general damage award to Mrs. McGlothlin and loss of consortium award to Mr. McGlothlin; $62,341.29 in past medical expenses and the expenses of reasonable medical treatment that will be incurred after the date of the trial court judgment; and all legal interest from the date of the filing of the complaint until paid as per La.R.S. 40:1299.47(M).[15]  We assess all costs of these proceedings, both at trial and on appeal, to Christus St. Patrick Hospital.

**REVERSED AND RENDERED.**

---

[15] Louisiana Revised Statutes 40:1299.47(M) provides that "[l]egal interest shall accrue from the date of filing of the complaint with the board on a judgment rendered by a court in a suit for medical malpractice brought after compliance with this Part."

22

10-278

**MARGIE McGLOTHLIN, ET AL.**

**VERSUS**

**CHRISTUS ST. PATRICK HOSPITAL**

**GREMILLION, Judge, concurs in part and dissents in part.**

This medical malpractice action involves the admissibility of the medical review panel's opinion and the prejudicial effect that panel opinion had on the outcome of a jury trial that resulted in a verdict in favor of the defendants. The majority concludes that the opinion should not have been admitted into evidence. On that point, I concur. However, the majority determines that a de novo review of the record reveals that the jury verdict should be reversed. From that conclusion I dissent.

Louisiana Revised Statute 40:1299.47(G) establishes the sole duty of the medical review panel. The panel is to render an opinion that the evidence does or does not support the conclusion that the defendant or defendants failed to comply with the appropriate standard of care, or that there is a genuine issue of material fact, not requiring expert testimony, for consideration by the court. When the panel deviates from that duty, its opinion may be excluded from evidence. *Whittington v. Savoy*, 05-1169 (La.App. 3 Cir. 5/31/06), 931 So.2d 1198.

The panel clearly discounted the accounts of injury supplied by the McGlothlins. In this, the panel deviated from its duty and its opinion should have been excluded.

I disagree that this case should be reviewed de novo. Rather, *Whittington v. Savoy*, 05-1169 (La.App. 3 Cir. 5/31/06), 931 So.2d 1198, illustrates the manner in which we should proceed. In *Whittington*, the plaintiff complained of the length of

the scar she bore following surgery. The panel opined that the length of the scar was immaterial, despite the fact that the length of the scar was the only allegation of malpractice. The trial court admitted the panel opinion into evidence. This court held that the panel exceeded its statutory duty in commenting upon the materiality of the length of plaintiff's scar. Nonetheless, the application of the manifest error standard necessitated affirming the trial court's judgment.

In the present matter, a review conducted under the manifest error standard would, I believe, result in upholding the findings of the jury. I would affirm the trial court.