# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

## 10-0867


**JOHN D. JEANE, JR., ET AL.**

**VERSUS**

**BYRD REGIONAL HOSPITAL, ET AL.**


************

APPEAL FROM THE
THIRTIETH JUDICIAL DISTRICT COURT
PARISH OF VERNON, NO. 75,746, Div. "A"
HONORABLE VERNON B. CLARK, DISTRICT JUDGE

************

**JIMMIE C. PETERS
JUDGE**

************

Court composed of Jimmie C. Peters, Elizabeth A. Pickett, and James T. Genovese, Judges.

**AFFIRMED.**


**Genovese, J., dissents and assigns reasons.**


**Edmund M. Thomas
A Professional Law Corporation
6104 Line Avenue, Ste. 4
Shreveport, LA 71106
(318) 219-9888
COUNSEL FOR PLAINTIFFS/APPELLANTS:**
    John D. Jeane, Jr.
    Nancy Willis

**James C. Stevens**
**Attorney at Law**
**4335 Richmond Avenue**
**Shreveport, LA 71106**
**(318) 861-4417**
**COUNSEL FOR PLAINTIFFS/APPELLANTS:**
    **John D. Jeanne, Jr.**
    **Nancy Willis**


**Richard L. Weil**
**Attorney at Law**
**P. O. Box 848**
**Bourg, LA 70343**
**(985) 594-4199**
**COUNSEL FOR DEFENDANT/APPELLEE:**
    **Guru P. Ghanta, M.D.**

PETERS, J.

The plaintiffs, John D. Jeane, Jr., and Nancy Willis, brought this medical malpractice action against a number of defendants,[1] including Dr. Guru P. Ghanta, to recover damages sustained as a result of the death of their son, Thomas Jaroed Jeane. They now appeal a trial court judgment in favor of Dr. Ghanta dismissing their claims. For the following reasons, we affirm the trial court's judgment.

**DISCUSSION OF THE RECORD**

The underlying facts giving rise to this litigation are not in dispute. Sometime in the early hours of August 11, 2002, Thomas Jeroed Jeane was involved in an altercation wherein he sustained a two and one-half centimeter knife wound to the left side of his chest. He was transported by private vehicle to Byrd Regional Hospital in Leesville, Louisiana, and presented himself to the emergency room at 2:25 a.m. that morning. Although his breathing was labored and his blood pressure was sixty-three over fifty-three when he arrived at the emergency room, he was alert and able to walk from a wheelchair to a stretcher after entering the facility.

Dr. Jerry R. Troy, the emergency room physician on duty when Mr. Jeane arrived, preliminarily suspected that Mr. Jeane could be suffering from a pneumothorax, which is the presence of air between the lung and the wall of the chest; a tension pneumothorax, which is a pneumothorax caused by a wound in the chest wall that permits air to enter but prevents its escape; and a cardiac injury. Twenty minutes after Mr. Jeane's arrival at the emergency room, Dr. Troy ordered a chest x-ray, an electrocardiogram (EKG), lab work, and an IV infusion of saline. As these instructions were being followed, Dr. Troy telephoned Dr. Guru P. Ghanta, a

---

[1]The plaintiffs also brought suit against Byrd Regional Hospital; Correct Care, Inc.; Dr. Jerry R. Troy; and LAMMICO, who insured Correct Care and Dr. Troy. However, these other four defendants were dismissed before trial and are not parties to this appeal.

general surgeon in private practice in Leesville, and requested that he come to the hospital. This telephone call was placed at 3:00 a.m. At 3:10 a.m., Mr. Jeane's blood pressure was sixty-seven over sixty-one.

When Dr. Ghanta arrived at the emergency room at 3:15 a.m., he ordered a second chest x-ray. He testified that he ordered the second x-ray because the first had revealed what appeared to be a normal size heart, and when he first examined Mr. Jeane he observed that the veins in Mr. Jeane's neck were not swollen. Given these initial findings, he was not sure if Mr. Jeane had sustained a cardiac injury. At 3:24 a.m., Mr. Jeane's blood pressure was 115 over seventy-four.

This second chest x-ray, which was taken at approximately 3:30 a.m., revealed that a large amount of blood had collected in Mr. Jeane's chest cavity, but still did not confirm a cardiac injury because Mr. Jeane's heart sounds were still normal, and there was no swelling in the neck vein. The second x-ray did confirm, however, Dr. Ghanta's suspicion that there was active bleeding in the chest from some source.

Dr. Ghanta then ordered a CT scan to check for any blood accumulations around the heart. This CT scan began at 3:40 a.m., or almost immediately after the second x-ray, and Dr. Ghanta reviewed it as it was taking place. According to Dr. Ghanta, the results of the CT scan established that Mr. Jeane had sustained a wound to the heart itself, and that the pericardium, which is a sac enclosing the heart, contained blood. After completion of the CT scan, Dr. Ghanta then reviewed the EKG that had been previously performed pursuant to Dr. Troy's instructions. Dr. Ghanta testified that after reviewing the EKG results, he knew that Mr. Jeane had suffered a small heart attack caused by an injury to a coronary artery.

Dr. Ghanta testified at trial that the large hole in the left ventricle of Mr. Jeane's heart was "killing him immediately," and that this injury had to be repaired or Mr. Jeane would not survive. Dr. Ghanta said that the injury to the coronary artery could be repaired later, if Mr. Jeane survived the repair to the left ventricle of his heart.

At approximately 3:40 a.m., Dr. Ghanta instructed the nurses to prepare the operating room for surgery. However, when Mr. Jeane returned from having the CT scan performed, his blood pressure had dropped to seventy-one over forty-eight and Dr. Ghanta did not consider him sufficiently stable for surgery. This was at 3:55 a.m., or one hour and thirty minutes after Mr. Jeane presented himself to the hospital.

Ten minutes later, at 4:05 a.m., Mr. Jeane's blood pressure had plummeted to forty-five over thirty-three. In an effort to stabilize his patient, Dr. Ghanta ordered a second blood transfusion and sped up the fluids that Mr. Jeane was already receiving. Ten minutes later, when Dr. Ghanta inserted a tube into Mr. Jeane's chest to drain blood out of his chest cavity, the patient's blood pressure had bounced back to some degree, being elevated to seventy-four over sixty-one. A third blood transfusion was begun at 4:30 a.m., and which time, Mr. Jeane's blood pressure had increased to 102 over seventy-five.

Within ten minutes after this third transfusion, Mr. Jeane arrived in the operating room, and Dr. Ghanta immediately made an incision into the left side of his chest cavity and observed that the pericardium was filled with blood. When Dr. Ghanta opened the pericardial sac, he observed a one and one-half inch laceration near the atrioventricular groove on the lateral aspect of the heart. Dr. Ghanta attempted to repair the laceration with sutures, but Mr. Jeane continued to bleed at the

3

point of the injury. Despite being administered ten additional units of blood, Mr. Jeane did not recover when he went into ventricular fibrillation (rapid, irregular fluttering of the ventricles of the heart in place of normal contractions, resulting in a loss of pulse and blood pressure) a second time. He was pronounced dead at 5:49 a.m.

On March 7, 2006, Mr. Jeane's parents brought suit against a number of defendants to recover the damages they sustained as a result of their son's death. At trial, Dr. Ghanta was the sole remaining defendant, and the plaintiffs asserted that Dr. Ghanta's failure to transfer Mr. Jeane to a hospital with heart bypass capabilities and staffed with a cardiovascular surgeon constituted medical malpractice. Following the two-day bench trial, the trial court rendered judgment in Dr. Ghanta's favor and dismissed the plaintiffs' suit against him.

On appeal, Mr. Jeane's parents assert three assignments of error:

1. The trial court committed legal error in allowing the medical review panel's comment on causation to be considered in its ruling; this error interdicted the fact finding process causing the facts in the record to be ignored.

2. The trial court committed manifest error in making factual findings unsupported by the record.

3. The trial court erred in its finding that Dr. Ghanta acted within the applicable standard of care in not transferring [Mr. Jeane] to a hospital equipped and staffed to handle [Mr. Jeane's] problem.

**OPINION**

*Assignment of Error Number One*

The plaintiffs' claims had first been submitted to a medical review panel pursuant to the Louisiana Medical Malpractice Act, La.R.S. 40:1299.41 *et seq.*, and

4

the medical review panel rejected their claims in a December 6, 2005 opinion that reads in pertinent part as follows:

REASONS FOR OPINION

After a careful review of all documents and evidence submitted for our review, and for the reasons espoused below, we find that the actions of the defendants herein, Bryd [sic] Regional Hospital, Correct Care, Inc. (Dr. Jerry R. Troy), Dr. Glen D. Hurlston, and Dr. Guru P. Ghanta, did not constitute a deviation from the applicable standard of care.

The patient herein, Thomas Jeane, a twenty (20) year old, white male, presented to the Emergency Room of Byrd Regional Hospital, at 0225, on August 11, 2002, with a stab wound to his left chest. He was met by the triage team and evaluated by defendant, Dr. Jerry Troy, an emergency medicine physician. The patient's vital signs were: blood pressure, 63/53; pulse, 217; respirations per minute, 24; temperature, 95.4°; and oxygen saturation, 87%. The patient described his pain as 8 out of 10. The patient was awake, responsive, and ambulating.

The stab wound to his left chest was cleaned and a dressing applied. A chest x-ray revealed some haziness of the left chest, but no significant pneumothorax. At 0245, an EKG and chest x-ray were performed. Thereafter, defendant, Dr. Guru Ghanta, a general surgeon, was consulted, and a CT scan ordered.

At 0340, the CT scan was performed, demonstrating that the stab wound extended into the patient's heart. An immediate thoracotomy was advised. Defendant, Dr. Ghanta, inserted a left chest tube while the patient was still in the emergency room, and, at 0440, the patient was transferred to the operating room for surgery. Defendant, Dr. Glen Hurlston, was the anesthesiologist on the case, and administered the anesthesia for the procedure.

The thoracotomy revealed that the patient's pericardium was full of blood. When the pericardial sac was opened, the surgeon noted a one and one-half (1 ½) inch long laceration near the atrioventricular groove on the lateral aspect of the heart. During the procedure, the patient went into ventricular fibrillation and was resuscitated. The patient went into ventricular fibrillation once again, but never recovered, and was pronounced dead almost three and one-half (3 ½) hours after his appearance at the emergency room, at 0549.

The claimant herein complains of generalized failure on the part of all defendants to timely and properly evaluate and treat the patient. Contrary to such assertions, the panel finds that the patient was timely

triaged, appropriate steps were taken to identify the extent of the injury, emergency surgery was initiated, but the damage to the patient's heart was significant enough to render all attempts to save him fruitless. The emergency room physician, the hospital personnel, the anesthesiologist, and the surgeon were faced with an individual who had sustained a life-ending wound, and performed heroically in an attempt to save his life. There was no inordinate delay at any stage of the treatment. The patient's blood pressure had been properly elevated prior to surgery. The wound sustained by the patient was near the atrioventicular groove, and involved both left anterior descending and circumflex coronary arteries. Lastly, the patient would not have survived a transfer to Shreveport or another facility, and the decision not to transfer was appropriate.

In their first assignment of error, the plaintiffs argue that the trial court erred in admitting the medical review panel opinion into evidence and that this error requires this court to undergo a *de novo* review of the trial court's decision. Specifically, the plaintiffs assert that the last paragraph quoted above should have been excluded "as it relates to causation."[2]

In considering this argument, we first note that La.R.S. 40:1299.47(H) provides in part that "[a]ny report of the expert opinion reached by the medical review panel *shall* be admissible as evidence in any action subsequently brought by the claimant in a court of law." (Emphasis added.) However, this court has held that admissibility of the medical review panel opinion under La.R.S. 40:1299.47(H) "presupposes the validity of the opinion itself." *Whittington v. Savoy*, 05-1169, p. 3 (La.App. 3 Cir. 5/31/06), 931 So.2d 1198, 1201. *See also, McGlothlin v. Christus St. Patrick Hosp.*, 10-278 (La.App. 3 Cir. 11/17/10), 50 So.3d 967.

With regard to the authority of the medical review panel, La.R.S. 40:1299.47(G) provides:

_____

[2]This issue was the subject of a motion in limine filed by the plaintiffs before trial that was rejected by the trial court.

The panel shall have the sole duty to express its expert opinion as to whether or not the evidence supports the conclusion that the defendant or defendants acted or failed to act within the appropriate standards of care. After reviewing all evidence and after any examination of the panel by counsel representing either party, the panel shall, within thirty days, render one or more of the following expert opinions, which shall be in writing and signed by the panelists, together with written reasons for their conclusions:

(1) The evidence supports the conclusion that the defendant or defendants failed to comply with the appropriate standard of care as charged in the complaint.

(2) The evidence does not support the conclusion that the defendant or defendants failed to meet the applicable standard of care as charged in the complaint.

(3) That there is a material issue of fact, not requiring expert opinion, bearing on liability for consideration by the court.

(4) When Paragraph (1) of this subsection is answered in the affirmative, that the conduct complained of was or was not a factor of the resultant damages. If such conduct was a factor, whether the plaintiff suffered: (a) any disability and the extent and duration of the disability, and (b) any permanent impairment and the percentage of the impairment.

The plaintiffs seem to argue that only when the medical malpractice panel concludes that there was a breach of the appropriate standard of care should it comment further—and even then only to the extent required by La.R.S. 40:1299.47(G)(4). We do not find that the statute should be read in such a restrictive manner. In fact such an interpretation ignores the clear language of the initial paragraph of La.R.S. 40:1299.47(G), which provides that the opinion is to include "written reasons for [the medical review panel's] conclusions."

In this case, the medical review panel's written reasons constitute nothing more than an appropriate explanation of how it reached its decision that Dr. Ghanta's actions did not breach any applicable standard of care. Additionally, neither the holding in *Whittington* nor that in *McGlothlin* supports the plaintiffs' position. In

7

each of those cases, the report was rendered inadmissible because the panel attempted to resolve questions of material fact not requiring expert opinion. Such action on the part of the medical malpractice panel is clearly prohibited by La.R.S. 40:1299.47(G)(3).

Because we find no merit in this assignment of error, we will review the trial court judgment under the manifest error standard of review. *Curtis v. Columbia Doctors' Hosp. of Opelousas*, 03-916 (La.App. 3 Cir. 12/17/03), 862 So.2d 1125.

### *Assignments of Error Number Two and Three*

The plaintiffs' final two assignments relate to the factual correctness of the judgment itself and will be considered together. In their second assignment of error, the plaintiffs assert that the trial court reached factual findings in its reasons for judgment not supported by the record. Specifically, they argue that the following findings of fact are not supported by the record:

1. The trial court erred when it said it "finds of great significance in the analysis of this case the medical records of Jeane's vital signs," and referred to Joby's fluctuating blood pressure readings and what it considered was a narrowing of the times between blood transfusions.

2. The trial court erred when it concluded that Joby would have died within 15 to 30 minutes had he not been taken into surgery, relying upon the testimony of Dr. Ivatury.

3. The trial court erred when it concluded that "Clearly, the evidence indicates that Jeane would have expired prior to reaching another hospital," which it noted was from 45 minutes to 1 hour away.

In their third assignment of error, they assert that the trial court erred in finding that Dr. Ghanta did not violate the appropriate standard of care when he failed to transfer Mr. Jeane to a hospital better equipped to handle his particular injury.

The trial court's written reasons for judgment read in part as follows:

The plaintiffs assert that Dr. Ghanta failed to comply with the appropriate standard of care by not transferring Jeane to a hospital in either Alexandria or Shreveport with Level I emergency room capability to perform by-pass heart surgery.

The Court heard the testimony of three doctors on behalf of the plaintiffs. They were Dr. Michael G. Futrell, a cardiologist, Dr. Francis C. Evans, a general surgeon, and Dr. Mark M. Mettauer, a cardiovascular surgeon. The last two testified through depositions which were offered by counsel. Defense counsel objected to the qualifications of both witnesses. The Court finds each witness qualified as tendered and overrules defense counsel's objection.

The defendant's case was the testimony of Dr. Ghanta and Dr. Rao R. Ivatury, a general surgeon and critical care physician.

The thrust of the plaintiff's expert witnesses was that Jeane had stabilized sufficiently and should have been transferred where heart/lung by-pass surgery, which was the only chance of survival for Jeane, would have been possible rather than keep him at Byrd Hospital which did not have by-pass equipment.

The Court notes that the three plaintiff's expert witnesses differed as to when he stabilized enough to transfer. Dr. Futrell and Dr. Evans felt that as the blood pressure stabilized with each transfusion, Jeane could have been transferred after the third transfusion and still survived the transfer. Dr. Mettauer stated that Dr. Troy should have ordered a transfer and to call in Dr. Ghanta was actually unnecessary. Nevertheless, each testified that the records of Jeane's blood pressure and pulse rate showed that Jeane was stable as late as the third transfusion at 4:30 A.M. when his vital signs appeared in the normal range.

To the contrary, Dr. Ghanta and Dr. Ivatury stated that they believed that Jeane was never stable enough to transfer and that surgery was the only option. They both testified that the records of Jeane's vital statistics support the belief that he was very quickly headed towards death.

The medical review panel unanimously reached the conclusion that Dr. Ghanta did not deviate below the standard of care. They believed the victim had a life-ending wound and the actions of the medical staff and doctors was appropriate and that transfer was not a realistic option.

The Court finds of great significance in the analysis of this case the medical records of Jeane's vital signs. Those records show a greatly fluctuating blood pressure and pulse rate from the time Jeane arrived to

the time he was taken to surgery. Part of the reason for the initial stabilization was the cardiac tamponade. However, at 3:55 A.M., Jeane's signs had dropped dangerously low and so a blood transfusion was given. That had the effect of bringing his vital signs back to a normal range. However, soon the vital signs dropped very low again and at 4:20 A.M., another transfusion was given. Again, that brought his vital signs up to normal range for a brief time. A third transfusion was needed again at 4:30 A.M. The Court notes that the time between the first two transfusions was twenty-five minutes. The time between the second and third transfusions was ten minutes.

The above records clearly show to this Court that the cardiac tamponade was not stabilizing Jeane, but rather the infusion of blood and liquids was and that the time necessary between transfusions was rapidly decreasing. Dr. Ivatury opined that Jeane would have died within fifteen to thirty minutes if not brought into surgery. The Court finds that the record of vital signs of Jeane support Dr. Ivatury's opinion.

This Court finds the opinions of the three experts of the plaintiffs are not supported by the medical records. Each of them stated that Jeane could have survived a transfer that would have taken a minimum of forty-five minutes to one hour. Clearly, the evidence indicates that Jeane would have expired prior to reaching another hospital. Dr. Ghanta's actions were all that could be done.

The Court finds that the plaintiffs failed to prove that Dr. Ghanta deviated below the applicable standard of care. The claim by plaintiffs is dismissed.

Both of these assignments of error address the trial court's factual findings based on the expert evidence presented in support of, and in opposition to, the plaintiffs' claims of medical malpractice. To establish their claims for medical malpractice, the plaintiffs had the burden of proving, by a preponderance of the evidence: (1) the standard of care applicable to Dr. Ghanta; (2) that Dr. Ghanta breached that standard of care; and (3) that there was a causal connection between the breach and the resulting injury. La.R.S. 9:2794.

In attempting to meet their burden of proof, the plaintiffs provided the trial court with the testimony of three expert witnesses: Dr. Mitchell G. Futrell, a

Shreveport, Louisiana cardiologist; Dr. Francis C. Evans, a Palm Coast, Florida general surgeon; and Dr. Mark M. Mettauer, a Houston, Texas cardiac, vascular, and thoracic surgeon. In addition to the medical review panel opinion and his own testimony, Dr. Ghanta provided the trial court with the testimony of Dr. Rao R. Ivatury, a Richmond, Virginia trauma and critical care surgeon.[3]

### *Dr. Mitchell G. Futrell's Testimony*

Dr. Futrell testified that Byrd Regional Hospital had policies and procedures in place, dating from November of 1986, which specifically addressed Dr. Ghanta's professional obligations to Mr. Jeane. He pointed out that the hospital's Policy and Procedure Manual stated that "patients requiring care not available at [Byrd Regional Hospital] are transferred by ground healthcare transportation or helicopter after acceptance by a physician in another facility and upon physician's order," and that Dr. Ghanta breached the standard of care he owed to Mr. Jeane when he did not transfer him to another hospital. Dr. Futrell explained that Byrd Regional Hospital did not have cardiac bypass equipment, which is "absolutely necessary" to treat a patient who has an injury to a coronary artery.

According to Dr. Futrell, the 2:55 a.m. EKG ordered by Dr. Troy revealed that Mr. Jeane had suffered a mild cardiac infarction, or heart attack, and that the variation in blood pressure was consistent with shock and was one sign of cardiac tamponade. Dr. Futrell explained that cardiac tamponade occurs when the heart is being constricted by blood in the pericardium to the point that the patient's blood pressure is dropping and the patient is in shock. Dr. Futrell agreed with Dr. Ghanta's

---

[3]One of Dr. Ivatury's expert qualifications presented to the trial court was the fact that he is the author of *The Textbook of Penetrating Trauma*, which he stated is the only textbook devoted to penetrating trauma and which focuses on injuries similar to the one suffered by Mr. Jeane.

diagnosis that Mr. Jeane had an injury to the left ventricle and to some part of the coronary artery.

Dr. Futrell testified that repairing a stab wound to the heart that involves the coronary arteries without using bypass equipment is an impossible task, and that had Mr. Jeane been treated at a level-one trauma facility by a cardiovascular surgeon with the proper equipment, his chance of survival would have been ninety percent. Dr. Futrell noted that two hospitals in Alexandria, Louisiana, were qualified to properly treat Mr. Jeane, as was the LSU Medical School in Shreveport, Louisiana. He suggested that, based on his research, transportation by airvac to Alexandria would take approximately twenty-five minutes in clear weather, and transportation by airvac to Shreveport under the same conditions would take approximately forty-five to fifty minutes. Ground emergency services, according to Dr. Futrell, would take forty-five minutes to Alexandria and between one and one-half hours and two hours to Shreveport. Dr. Futrell could not testify that either a helicopter or a ground ambulance was available in the early morning hours of August 11, 2002.

With regard to Mr. Jeane's ability to withstand any transfer to another facility, Dr. Futrell testified the patient was sufficiently stable to transport after he began receiving some fluids. He pointed to Mr. Jeane's 115 over seventy-four blood pressure at 3:24 a.m. and suggested that he was "certainly stable" at that point, and that "he was stable from that point throughout the remainder of his hospitalization." In his opinion, it should have taken no more than ten minutes to prepare Mr. Jeane for transfer to another hospital. Dr. Futrell further testified that everything that was being done for Mr. Jeane at Byrd Regional Hospital—giving blood, giving fluids, and monitoring the patient—could have been done in an ambulance during transfer.

12

The deciding point, according to Dr. Futrell, should have been when Dr. Ghanta had access to the EKG results. Failure to transport at that point was, according to Dr. Futrell, a deviation from the applicable standard of care. Additionally, Dr. Futrell concluded that if Dr. Ghanta did not realize that the stab wound was to the heart at this point, and that it involved the left ventricle, he deviated from the applicable standard of care in taking no steps to have the EKG analyzed further. On the other hand, if he did appreciate the fact that Mr. Jeane suffered from a left ventricle injury, Dr. Ghanta breached the applicable standard of care by operating on Mr. Jeane in that he lacked the appropriate training and surgical skills to attempt to repair the coronary artery.

### Dr. Francis Evans' Testimony

Dr. Evans agreed that the standard of care applicable to Dr. Ghanta required that seriously ill patients be transferred to trauma centers whenever possible. In Mr. Jeane's situation, according to Dr. Evans, the standard of care required that Dr. Ghanta at least consider transferring Mr. Jeane to a trauma center. However, Dr. Evans also testified that he was surprised Mr. Jeane survived for two hours with a knife wound which severed major coronary arteries and lacerated his heart. But for the fact that a clot formed in the pericardial sac after it was penetrated by the knife, Dr. Evans reasoned, Mr. Jeane's bleeding would have been out of control and he would never have reached the hospital.

Dr. Evans testified that the CT scan confirmed the diagnosis of a cardiac tamponade and that typically a general surgeon would put a patient on bypass before opening and operating on the heart in such a situation. He further opined that with

cardiopulmonary bypass surgery Mr. Jeane more probably than not would have survived.

Although Dr. Evans concluded that Mr. Jeane "was unstable the entire time he was in the emergency room," he believed the patient would have survived the transfer to Alexandria. He explained that Mr. Jeane needed blood and fluids, and those could have been given in an ambulance en route. Dr. Evans' principal complaint with Dr. Ghanta's actions was that Dr. Ghanta did not inquire about a transfer at any time during his treatment of Mr. Jeane. He considered this to be a breach of the standard of care.

### *Dr. Mark M. Mettauer's Testimony*

Dr. Mettauer testified that Mr. Jeane should have been transferred within the first thirty minutes after his arrival at Byrd Regional Hospital.[4] He suggested that when first called, Dr. Ghanta breached the applicable standard of care by not telling Dr. Troy to stabilize Mr. Jeane and ship him to another hospital. Further, Dr. Mettauer opined, when Dr. Ghanta arrived at the hospital, he should have realized that Mr. Jeane needed to be transferred. In Dr. Mettauer's opinion, at the time Dr. Ghanta arrived on the scene, Mr. Jeane's probability of survival was significant if he were properly treated. Despite his suggestions concerning immediate transfer, however, Dr. Mettauer acknowledged that the applicable standard of care required that the treating physician must first determine whether a patient is stable for a transfer before transferring him to another hospital. Still, Dr. Mettauer explained that one must assume that the patient has a cardiac injury,[5] and that the patient could be

---

[4]We note that it was more than thirty minutes before Dr. Ghanta was called to the hospital.

[5]Dr. Mettauer testified that the CT scan was indisputable evidence that Mr. Jeane had a cardiac injury.

14

resuscitated in the ambulance. For Mr. Jeane's suspected problem, he was stable enough to ship out.

According to Dr. Mettauer, Dr. Ghanta also breached the applicable standard of care after surgery began. Dr. Mettauer testified that when Dr. Ghanta opened Mr. Jeane up and saw a cardiac injury, Dr. Ghanta should have closed him up immediately and transferred him.

### Dr. Guru P. Ghanta's Testimony

Dr. Ghanta acknowledged that he did not comply with the hospital's policy concerning transportation of a person requiring care not available at Byrd Regional Hospital. According to the doctor, he considered transferring Mr. Jeane to Shreveport[6] but was unable to make the telephone call to find a facility that would accept Mr. Jeane because he was too busy stabilizing the patient. In his experience, transfer to a Shreveport facility required a minimum of two hours, and he did not feel the patient was sufficiently stable for such a transfer, given that fact that his blood pressure was continuously fluctuating. Dr. Ghanta also said that Mr. Jeane would not have survived a transfer, that he would have died ten minutes out of the hospital because the clot in the pericardium would have dislodged and Mr. Jeane would have bled to death. Dr. Ghanta testified that he made the final decision not to transfer Mr. Jeane shortly before he opted for surgery, when Mr. Jeane's blood pressure was sixty systolic, which meant that he was "crashing." Dr. Ghanta said that he decided to operate on Mr. Jeane at that point in an effort to save him from certain death.

Dr. Ghanta testified that after reviewing the CT scan results in conjunction with the first EKG, he was aware that the coronary arteries might have been injured by the

---

[6]He never considered Alexandria as an alternative because he did not think either hospital in Alexandria had a trauma center.

15

knife wound Mr. Jeane sustained. Additionally, Dr. Ghanta agreed that coronary artery injuries must be repaired on bypass and that a coronary artery injury was something that would require the expertise of a cardiovascular surgeon and could not be repaired at Byrd Regional Hospital. However, in his opinion, that would have to wait for repair of the more pressing life-threatening injury to the ventricular chamber.

### Dr. Rao R. Ivatury's Testimony

Dr. Ivatury testified that when a patient presents himself with an injury to the heart, the first requirement of the applicable standard of care is to control the laceration from the ventricle. Only when that laceration is under control can the doctor make arrangements for repair of the coronary arteries. Dr. Ivatury testified that although Mr. Jeane should have been transferred to a facility that could have repaired the coronary arteries, the main injury was the injury to the left ventricle of the heart. According to Dr. Ivatury, a trauma surgeon is expected to determine what treatment will give a patient the best chance to survive his injury, and in the case of Mr. Jeane, the immediate threat to his life was the bleeding from the laceration to the left ventricle and the ensuing cardiac tamponade, not the coronary artery injury.

Dr. Ivatury acknowledged that if Dr. Ghanta had been aware that there was a likelihood of an injury to a coronary artery, he should have known that he could not repair that injury.[7] However, Dr. Ivatury stated that statistics would support a belief that a stab wound similar to the one suffered by Mr. Jeane would more likely injure only the ventricle, and not the coronary vessels. Further, Dr. Ivatury testified that even if the treating surgeon had diagnosed an injury to the coronary artery, if the patient were too unstable to transfer then the appropriate treatment would have been

---

[7]As we have previously noted, Dr. Ghanta testified that after reviewing the EKG results he knew Mr. Jeane had suffered a small heart attack caused by an injury to a coronary artery.

16

to attempt to repair the wound in the left ventricle, hoping that the diagnosis of coronary artery injury was wrong.

Dr. Ivatury testified that Mr. Jeane was actively bleeding from the stab wound to his heart into the fibrous sac around his heart. Dr. Ivatury explained that this sac can only accommodate about seventy-five to a hundred cubic centimeters of blood; and, as the blood begins to accumulate, the patient's cardiac output suffers, and his blood pressure will begin dropping. Dr. Ivatury testified that this dropping blood pressure is very easy to counteract initially, by giving fluid and blood, but that this increases the bleeding and therefore the pressure around the heart, creating a "vicious circle." Dr. Ivatury testified that he has seen at least fifty to a hundred patients with this problem in the last thirty years, and that the patients look good until there is a "point of no return" when they have a precipitous drop in blood pressure, causing a cardiac arrest and death. Dr. Ivatury testified that had Dr. Ghanta not intervened and operated on Mr. Jeane, he would certainly have died within fifteen to twenty minutes; and that when Dr. Ghanta decided to operate Mr. Jeane had at best fifteen to twenty minutes to live.

Dr. Ivatury testified that before a patient can be transferred to another facility, he must be stable for transfer, and that Mr. Jeane was not ever stable enough to transfer. He based this opinion on the medical records showing that Mr. Jeane's blood pressure was fluctuating, going up when Mr. Jeane received a transfusion of fluids or blood and then coming down again.[8] Dr. Ivatury further testified that Dr.

---

[8]The Byrd Regional Hospital records establish the following blood pressure readings were taken between the time Mr. Jeane arrived at the hospital and the beginning of surgery: 2:31 a.m. - sixty-three over fifty-three; 2:48 a.m. - sixty-eight over fifty; 3:08 a.m. - fifty-two over forty-two; 3:10 a.m. - sixty-seven over sixty-one; 3:24 a.m. - 115 over seventy-four; 3:25 a.m. - 113 over seventy-two; 3:49 a.m. - seventy over thirty-nine; 3:55 a.m. - seventy-one over forty-eight; 4:05 a.m. - forty-five over thirty-three; 4:07 a.m. - 101 over thirty-eight; 4:10 a.m. - fifty-seven over forty-two; 4:13 a.m. - seventy-six over fifty-seven; 4:15 a.m. - seventy-four over sixty-one; 4:20 a.m. - seventy-

17

Ghanta's decision that Mr. Jeane would most likely die en route if he transferred him to another facility was correct.

Dr. Ivatury said that Dr. Ghanta did not do anything that contributed to Mr. Jeane's death and that everything Dr. Ghanta did was appropriate for the circumstances. According to Dr. Ivatury, Dr. Ghanta did consider a transfer and properly ruled it out. Thus, Dr. Ghanta met the standard of care for a trauma surgeon.

### Applicable Standard of Care

As is reflected by the summary of the various experts' testimony, the experts concluded that more than one standard of care was at issue in this litigation. However, on appeal, the plaintiffs question only whether the trial court erred in concluding that Dr. Ghanta did not violate the applicable standard of care in not transferring Mr. Jeane "to a hospital equipped and staffed to handle his problem."

### Analysis of Standard of Care Violation

Whether a health care provider's conduct falls below the applicable standard of care is a factual determination that is subject to the manifest error standard of review. *Curtis*, 862 So.2d 1125. Our review of the trial court's factual findings must be conducted in accordance our supreme court's guidance that, "[i]f the trial court or jury's findings are reasonable in light of the record reviewed in its entirety, the court of appeal may not reverse, even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently." *Sistler v. Liberty Mut. Ins. Co.*, 558 So.2d 1106, 1112 (La.1990). In undertaking this review, we must not

---

five over sixty-five; 4:21 a.m. - 107 over sixty-six; 4:23 a.m. - 102 over seventy-eight; 4:25 a.m. - ninety-six over eighty-two; and 4:30 a.m. - 102 over seventy-five. The records reflect a notation of "NO READING" at 3:40 a.m. This corresponds to the time of the CT scan.

substitute our own factual findings for that of the trier of fact, and the evidence must be viewed in the light most favorable to the party who prevailed before the trier of fact – here, Dr. Ghanta. *Thibodeaux v. Jurgelsky*, 04-2004 (La. 3/11/05), 898 So.2d 299, *writ denied*, 04-2126 (La. 6/17/05), 904 So.2d 707. Also, "[w]here there are two permissible views of the evidence, the factfinder's choice between them cannot be manifestly erroneous or clearly wrong." *Rosell v. ESCO*, 549 So.2d 840, 844 (La.1989). However, reversal is required when this court finds that the trial court's verdict was clearly without evidentiary support, or clearly wrong based on the evidence. *Ambrose v. New Orleans Police Dep't Ambulance Serv.*, 93-3099 (La. 7/5/94), 639 So.2d 216.

As we appreciate the testimony of all the physicians, none would suggest that the Byrd Regional Hospital hospital policy lacks any flexibility whatsoever. The policy itself requires acceptance by a physician at another facility and presupposes that it is in the best interest of the patient to be transferred. That is to say, before transfer the patient should be sufficiently stable to withstand the trip. The testimony is clearly in conflict on this latter requirement. Drs. Futrell, Evans, and Mettauer were all of the opinion that Mr. Jeane was sufficiently stable to transfer,[9] while the members of the medical review panel and Drs. Ghanta and Ivatury were all of the opinion that Mr. Jeane was never sufficiently stable to survive the transfer. Furthermore, while the physicians testifying for the plaintiffs placed their emphasis on Dr. Ghanta's failure to transfer Mr. Jeane, Dr. Ivatury pointed out that the first requirement of the transfer standard of care is that the treating physician control the

_____

[9]We also note, however, that Dr. Evans was surprised that Mr. Jeane survived the initial trip to the hospital. According to Dr. Evans, the blood clot that formed in the pericardial sac prevented Mr. Jeane from bleeding to death internally almost immediately after being stabbed. Additionally, Dr. Mettauer seemed to place more emphasis on Dr. Troy's failure to transfer Mr. Jeane immediately after he presented himself to the emergency room than on Dr. Ghanta's actions..

bleeding from the laceration of the ventricle. Failure to gain control of this immediately life-threatening aspect of Mr. Jeane's injury would make transfer a vain and useless act. While Drs. Futrell, Evans, and Mettauer suggested that Mr. Jeane could continue to receive life supporting fluids and blood during the transfer, none addressed Dr. Ivatury's point that the continuous transfusions were contributing to a downward spiraling "vicious circle" because of the pressure being placed on the heart by infusion of the additional blood. Absent implementation of the drainage tube inserted by Dr. Ghanta, the pressure would continue to build.[10]

It is obvious from the trial court's reasons for judgment that it accepted Dr. Ghanta's reasoning for not transferring Mr. Jeane and that it accorded Dr. Ivatury's testimony more weight than that of the other medical experts on this issue. "The determination of an expert's credibility is also a factual question subject to the manifestly erroneous/clearly wrong standard of review." *Martin v. E. Jefferson Gen. Hosp.*, 582 So.2d 1272, 1277 (La.1991). Viewing the evidence in the light most favorable to Dr. Ghanta, and recognizing that there may be two permissible views of the evidence, we cannot not substitute our own factual findings for those of the trial court. We cannot say that the trial court was clearly wrong in its factual determinations. Thus, we find no merit in the plaintiffs' second assignment of error.

Applying the same review criteria to the plaintiffs' remaining assignment of error, we find no manifest error in the trial court's determination that Dr. Ghanta's treatment of Mr. Jeane violated the applicable standard of care. Thus, we find no merit in this assignment of error as well.

---

[10]None of the physicians who testified addressed whether the ambulance crew could do anything more than administer fluids and, therefore, did not testify whether they could adequately control the fluids through the drainage tube.

## DISPOSITION

For the foregoing reasons, we affirm the trial court judgment in all respects. We assess all costs of this appeal to the plaintiffs, John D. Jeane, Jr. and Nancy Willis.

**AFFIRMED.**

# STATE OF LOUISIANA

## COURT OF APPEAL, THIRD CIRCUIT

## 10-867

JOHN D. JEANE, JR., ET AL.

VERSUS

BYRD REGIONAL HOSPITAL, ET AL.

**GENOVESE, J., dissents and assigns the following reasons.**

In this medical malpractice case, the majority finds no manifest error in the trial court's determination that Dr. Ghanta did not violate the applicable standard of care in his treatment of Mr. Jeane. I disagree.

It is undisputed that Dr. Ghanta knowingly violated the hospital's transfer policy. Mr. Jeane presented himself to Byrd Regional Hospital (Byrd Hospital) with a one-inch, V-shaped stab wound to his heart. According to the transfer policy at Byrd Hospital, patients requiring care not available at that hospital are to be transferred after acceptance by a physician at another facility upon the physician's order. It is likewise undisputed that Byrd Hospital had no cardiovascular surgeon on its staff and had no bypass equipment. Dr. Ghanta admitted that he did not follow this policy in connection with Mr. Jeane's treatment. The time entries in the hospital records are well-documented and likewise not in dispute. Mr. Jeane was brought to Byrd Hospital at 2:25 a.m. After notification by the emergency room physician, Dr. Ghanta arrived at the hospital at 3:15 a.m. Dr. Ghanta instructed the nurses to prepare the operating room for surgery at 3:40 a.m., yet he did not perform surgery until after 4:30 a.m. Mr. Jeane died at 5:49 a.m. There was a time lapse of over two hours from admission to surgery. It took Dr. Ghanta over an hour to decide to implement surgery—all the while Mr. Jeane could and should have been transferred,

but was not.

It is noteworthy that Mr. Jeane was not in persistent acute distress. In fact, the record indicates that Mr. Jeane was responding to treatment and was still awake and alert at 4:30 a.m., after having arrived at the hospital over two hours earlier. There was plenty of time and patient stability to effectuate a transfer to a cardiovascular facility—but that was not done.

Mr. Jeane suffered a stab wound to the heart. Dr. Ghanta is a general surgeon, not a cardiovascular surgeon. It is undisputed that Dr. Ghanta knew that Byrd Hospital had no cardiovascular surgeons and no bypass equipment to adequately care for an injury of this nature. Yet, Dr. Ghanta persisted in violating hospital policy in not transferring Mr. Jeane to the nearest hospital with cardiac care capabilities. Plaintiffs' experts testified that had Dr. Ghanta timely effectuated the transfer, Mr. Jeane would have had a ninety percent chance of survival.

Dr. Ghanta's efforts were both noble and well-intentioned; however, he breached the applicable standard of care by violating hospital transfer policy and by implementing sophisticated cardiovascular treatment without being a cardiovascular surgeon at a hospital not equipped for such treatment. In my view, the trial court's decision was manifestly erroneous and renders Byrd Hospital's transfer policy meaningless.

I would reverse the trial court, find that Dr. Ghanta violated the applicable standard of care relative to Mr. Jeane, and award appropriate damages.